No. 3--96--0673

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 1997

_________________________________________________________________

THE PEOPLE OF THE STATE OF ) Appeal from the Circuit Court

ILLINOIS,       ) of the 13th Judicial Circuit,

) Bureau County, Illinois

Plaintiff-Appellee, ) 

)

v. ) No. 96--CF--16

)

MIGUEL PEREZ, ) Honorable

) James J. Wimbiscus,

Defendant-Appellant. ) Judge Presiding

_________________________________________________________________

Consolidated with No. 3--96--0674

_________________________________________________________________

THE PEOPLE OF THE STATE OF ) Appeal from the Circuit Court

ILLINOIS,       ) of the 13th Judicial Circuit,

) Bureau County, Illinois

Plaintiff-Appellee, ) 

)

v. ) No. 96--CF--17

)

CARLOS J. DIAZ, ) Honorable

) James J. Wimbiscus,

Defendant-Appellant. ) Judge Presiding

_________________________________________________________________

JUSTICE McCUSKEY delivered the opinion of the court:

_________________________________________________________________

Following a stipulated bench trial, the defendants, Miguel Perez and Carlos J. Diaz, were convicted of controlled substance trafficking (720 ILCS 570/401.1 (West 1994)).  Pursuant to an agreement, both defendants were sentenced to a term of 40 years in the Department of Corrections.  The defendants each filed a timely notice of appeal.  The appeals were consolidated by this court.

On appeal, both defendants argue that the trial court erred when it found: (1) the initial stop of Perez's truck was lawful; (2) the police officer did not illegally detain the defendants; and (3) that Perez gave a valid oral consent to search and dismantle the truck.  In addition, Diaz argues: (1) the trial court erred when it found Diaz did not have standing to challenge the search; and (2) that his sentence is excessive.  Following our careful review of the record, we affirm the trial court's judgment in both cases.  

FACTS

At 8:13 a.m. on February 19, 1996, John Balma, a sergeant with the Illinois State police, stopped a Chevy truck on I-80 near Princeton.  Perez was driving the truck, and Diaz was a passenger in the vehicle.  At the suppression hearing, Trooper Balma testified that he saw the truck move partially over the center line from the right lane into the left lane.  Balma stated that this happened several times and, at one point, almost half of the truck was in the left lane.  Balma said the truck did not signal a lane change.  At the time of the stop, Balma activated the video camera installed in his State police car.  He was also wearing a battery operated microphone which transmitted the sound to the camera.  The videotape (tape) of the stop was played at the suppression hearing.  The tape clearly shows Balma approached the truck and told Perez that he saw him weave over the center line several times.  

Balma testified that, when he pulled in behind the vehicle to effect a stop, he noticed the spare tire underneath the truck was much lower than usual.  Balma was very familiar with trucks  because of his experience as a State trooper for eight years.  In addition, he said that he worked as a trucker for 15 years before he joined the Illinois State police.  Based upon his experience and knowledge, Balma believed that the rear portion of the truck had been modified in some way.

Balma said he asked both Perez and Diaz for a driver's license.  Perez told Balma that he had a temporary registration for the vehicle.  Balma thought this response was odd because the truck had license plates.  At 8:15 a.m., Perez went with Balma to the squad car and sat in the passenger seat.  Balma radioed in a request for a driver's license check on both licenses.  He also requested a criminal history background check and a warrant check.  Balma talked continually to Perez while he was seated in the squad car.  Most of the conversation can be clearly heard on the tape.  It appears from the tape that Perez did not understand some of Balma's questions.  However, when the questions were rephrased, Perez gave responsive answers.  Perez told Balma that he was an auto mechanic in New York and had driven to California to purchase auto parts.  Balma said he was checking the ownership papers on the vehicle while he talked to Perez.  

At about 8:19 a.m., Balma started writing a written warning.  He finished the warning at about 8:21 a.m.  Balma then opened the door of his squad car, intending to go back to the truck to return Diaz's driver's license and check the temporary registration.  At that point, a radio report came in which said that Perez's license was valid and he had no warrants or criminal history.  The report on Diaz said that he had a 1985 controlled substance conviction in Pennsylvania.  However, Diaz was 22 years old at the time of the stop and would have been only 11 years old in 1985.  In fact, Diaz was later found to have no prior convictions.  

At 8:22 a.m., Balma called in to request a canine unit.  Balma then walked to the truck, spoke to Diaz and gave him his driver's license.  Balma also checked and found the temporary registration on the window of the truck matched the vehicle identification number.

At 8:25 a.m., Balma returned to his squad car.  He asked Perez to sign the warning, which Perez did.  Balma testified that he then gave Perez his driver's license and a copy of the warning.  At 8:26 a.m., Balma stated, "that's all there is to the stop and you're free to go."  After a very brief pause, Balma asked Perez if he had anything illegal in the truck.  Perez said, "[n]o."  Balma responded, "okay if I look?" and Perez clearly answered, "[y]eah."  Balma said, "[i]s it okay?" and Perez again answered, "[y]eah."  Balma then prepared a consent to search form which was written in Spanish.  At 8:27 a.m., Perez signed the form.  Testimony was presented at the suppression hearing which indicated that the Spanish form was not written in the clearest language.  Also, it appears from the record that Perez did not read the form when it was presented to him.  

Balma then went to the truck with Perez and had Perez remove the tarp from the back of the vehicle.  Balma looked at the items in the bed of the truck, which did include some auto parts.  At 8:29 a.m., Balma looked closely at the underside of the vehicle.  He testified that this look confirmed his suspicion that a compartment was built onto the underside of the truck.  He told Perez that he was waiting for the other officer to arrive.  At no time did Perez object to the length of his detention or tell Balma to stop searching the vehicle.   

At 8:38 a.m., Trooper Craig Graham finally arrived with his dog.  The parties stipulated that the State would not present any evidence regarding the actions of the dog in order to establish probable cause for the search.  In fact, the tape shows no discernable alert by Graham's dog.  At 8:41 a.m., Graham looked underneath the truck.  Balma told him that the bumper had previously been removed.  At 8:42 a.m., Graham did a patdown search of Diaz for weapons, and Balma conducted a patdown search of Perez.  At 8:45 a.m., Graham began removing the truck's bumper.  At 8:48 a.m., Graham could see packages in an enclosed area under the truck that, in his experience, were "common packaging for narcotics."  At that point, both defendants were placed under arrest.  At 8:51 a.m., Graham drilled into the sheet metal bottom of the compartment.  Balma field tested the white powder on the drill, and it tested positive for cocaine.  

The truck was then towed to State police headquarters in La Salle.  A search there revealed an enclosed area between the frame rails of the truck with a sheet metal bottom.  Inside the compartment were twenty large packages, each of which held five smaller packages of white powder. Testing showed that the packages held 250.3 pounds of 93.7% pure cocaine.  The cocaine which was seized at the State police headquarters had a street value of over $37 million.  

Perez testified that he did not understand English very well.  He also said he did not understand Balma when Balma told him "that's all there is to the stop and you're free to go."  However, Perez admitted that he answered, "yeah," when Balma asked him if it was okay to look in the truck.  Moreover, Perez did not testify that he had any difficulty understanding Balma's question.  Perez said he thought Balma only wanted to look at the auto parts.  However, he did acknowledge that he never told Balma to stop searching the vehicle.  Both Perez and Diaz testified that, throughout the stop, Balma was "polite" and "kind."

On June 21, 1996, the trial judge denied the defendants' motions to suppress.   Prior to his ruling, the judge watched the tape in its entirety twice.  The judge stated that he was satisfied with Balma's description of Perez's driving.  Consequently, the judge found the initial stop was valid.  Also, he found the written consent form meant absolutely nothing in this case.  However, the judge did find Perez gave a valid oral consent to the search of the truck.  The judge said the tape confirmed that Balma did not use any threats or put any pressure on Perez to gain the consent to search.  The tape also confirmed that Balma was polite and helpful throughout the stop.  Finally, the tape showed, and Perez testified, that he agreed to the search and at no time did he tell Balma to stop searching the truck.  

On August 1, 1996, both defendants signed a written jury waiver and a stipulated bench trial took place.  After reviewing the stipulated evidence, the trial court found both defendants guilty.  The prosecutor and both defendants informed the court that they had agreed on a sentence of 40 years' imprisonment.  Both defendants waived the preparation of a presentence investigation report.  As part of the agreement, the State waived the mandatory street value fine and costs.  Pursuant to the agreement, the court imposed the 40-year sentence.  Following sentencing, Diaz's attorney filed a motion to reduce the sentence.  The trial court denied this motion.  Thereafter, both defendants filed a timely notice of appeal.

ANALYSIS 

I.  SUPPRESSION OF EVIDENCE

The defendants both argue that the trial court should have granted their motions to suppress because: (1) the initial stop was not lawful; (2) they were detained an unreasonable length of time; and (3) no valid consent was given to the search.  Following our careful consideration of these arguments, we disagree with the defendants' claims.  

A.  STANDARD OF REVIEW

The trial court's ultimate determination regarding the reasonableness of a warrantless search is subject to 
de
 
novo
 review.  
Ornelas v. United States
, 517 U.S. ___, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657 (1996); see also 
People v. Kidd
, 175 Ill. 2d 1, 25-26, 675 N.E.2d 910, 922 (1996).  However, the trial court's determination concerning factual matters, including the reasonable inferences to be drawn from the witnesses' testimony, is entitled to deference by a reviewing court.  
People v. Moore
, 286 Ill. App. 3d 649, 652, 676 N.E.2d 700, 703 (1997); see also 
Ornelas
, 517 U.S.___, 134 L. Ed 2d at 920-21, 116 S. Ct. 1657.  In this case, the trial court made specific factual and credibility findings.  A reviewing court will not reverse a trial judge's factual findings unless they are found to be manifestly erroneous.  
Moore
, 286 Ill. App. 3d at 652, 676 N.E.2d at 703.

B.  INITIAL STOP

It is well-established law that a traffic violation generally provides a sufficient basis for a police officer to stop the offending vehicle.  
Whren v. United States
, 517 U.S. ___, 135 L. Ed. 2d 89, 95-96, 116 S. Ct. 1769 (1996); 
People v. Hood
, 265 Ill. App. 3d 232, 241, 638 N.E.2d 264, 271 (1994).  Accordingly, a motorist may properly be stopped when his vehicle crosses over a lane line and the vehicle is not driven as nearly as possible within one lane of the highway.  
People v. Smith
, 172 Ill. 2d 289, 297, 665 N.E.2d 1215, 1219 (1996).  

In this case, Balma said he saw Perez's truck cross over the center line several times.  Balma's testimony was consistent with his comments to Perez immediately after he stopped the vehicle.  The trial judge found Trooper Balma's testimony to be credible.  Also, the judge specifically said that he was satisfied with Balma's explanation for the stop.  From our review, we conclude that the trial judge's factual finding on this issue is supported by the record and is not manifestly erroneous.  Accordingly, because the record firmly supports the trial judge's determination that a traffic violation occurred, we will not disturb the trial court's finding that the stop was proper.

C.  LENGTH OF DETENTION

The defendants next contend that the scope and length of the detention were unreasonable under the fourth amendment of the United States Constitution.  They argue that Balma improperly ordered Perez out of his truck and improperly extended the detention.  

Initially, we must note that the United States Supreme Court has recently repeated its earlier holding that "'once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.'"  
Ohio v. Robinette
, 519 U.S. ___, 136 L. Ed. 2d 347, 354, 117 S. Ct. 417 (1996), quoting 
Pennsylvania v. Mimms
, 434 U.S. 106, 111 n.6, 54 L. Ed. 2d 331, 337 n.6, 98 S. Ct. 330 (1977).  Accordingly, Balma did not act improperly when he asked Perez to get out of the truck and directed Perez to accompany him to the squad car.

Next, we will review whether the defendants were detained an unreasonable length of time.  It is well established that, when a police officer stops a vehicle for a minor traffic violation, the officer may briefly detain the driver to request a driver's license and make some initial inquiries.  
People v. Easley
, Nos. 3--96--0364, 3--96--0365, slip op. at 5 (May 30, 1997); 
People v. Koutsakis
, 272 Ill. App. 3d 159, 163, 649 N.E.2d 605, 608 (1995).  If no further suspicion is aroused in the officer following these initial inquiries, the traffic stop may not go further, and the individuals involved should no longer be detained.  
Easley
, slip op. at 5; 
Koutsakis
, 272 Ill. App. 3d at 163, 649 N.E.2d at 608.  Accordingly, in 
Koutsakis
, this court affirmed the trial court's finding that a detention of 14 minutes or longer to write a warning ticket is "too long."  
Koutsakis
, 272 Ill. App. 3d at 164-65, 649 N.E.2d at 609.

Here, in this case, we find that Balma completed the written warning at 8:21 a.m, eight minutes after the stop.  The eight-minute detention to write the warning ticket is shorter than the time period found to be too lengthy in 
Koutsakis
.  Moreover, where a police officer's suspicion is aroused during his initial inquiries, further detention may be warranted.  
United States v. Finke
, 85 F.3d 1275, 1280 (7th Cir. 1996); 
Easley
, slip op. at 5.  In deciding whether reasonable suspicion exists to justify the detention, we must consider the totality of the circumstances or the "whole picture" in each case.  
Easley
, slip op. at 5; 
People v. Anaya
, 279 Ill. App. 3d 940, 945-46, 665 N.E.2d 525, 529 (1996).  Even where there may be an innocent explanation for each individual factor considered separately, the factors viewed in combination may constitute enough reasonable suspicion to warrant further detention in a given case.  
Finke
, 85 F.3d at 1280; 
Easley
, slip op. at 5-6.

In the instant case, when 
Balma completed the written warning, he believed there might be a compartment under the vehicle based upon his extensive knowledge of trucks.  Further, Balma thought it was suspicious that the truck had a temporary registration sticker as well as license plates.  Also, Perez gave a patently implausible explanation for the trip to California.  In addition, Balma received information that Diaz had a prior drug conviction.  All of these factors in combination raised reasonable suspicions in Balma that the truck may contain drugs.  As a result, Balma requested the canine unit at 8:22 a.m.  We are cognizant of the fact that the prior drug conviction information later proved to be false.  However, we conclude that, based upon all the information available to Balma, he had sufficient reasonable suspicion to detain the defendants for a few additional minutes to allow the drug-sniffing dog to arrive.  See 
Finke
, 85 F.3d at 1281; 
Easley
, slip op. at 6.  From our review of all the circumstances, we conclude that the defendants were not detained an unreasonable length of time when Perez consented to the search four minutes later, at 8:26 a.m.  We additionally note, just as we did in 
Easley
, that the record is clear that the defendants never objected to the short additional detention.  Moreover, the tape confirms that Balma never used any form of coercion to cause the defendants to stay after the warning ticket was issued.  See 
Easley
, slip op. at 6.

D.  CONSENT TO SEARCH

The defendants next contend that the trial court erred when it found Perez gave a valid oral consent to search the truck.  Again, we disagree with the defendant's claim.

A search which is conducted pursuant to consent is one of the specifically established exceptions to the fourth amendment requirements of both a warrant and probable cause.  
People v. Cardenas
, 237 Ill. App. 3d 584, 587, 604 N.E.2d 953, 955 (1992).  The fourth amendment test for a valid consent to search is the requirement that consent be voluntary.  
Robinette
, 519 U.S. ___, 136 L. Ed. 2d at 355, 117 S. Ct. 417; 
Cardenas
, 237 Ill. App. 3d at 587, 604 N.E.2d at 955.  Voluntariness is a question of fact to be determined from the totality of the circumstances.  
Robinette
, 519 U.S. ___, 136 L. Ed. 2d at 355, 117 S. Ct. 417; 
People v. Graf
, 265 Ill. App. 3d 746, 750, 638 N.E.2d 1181, 1184 (1994).  Consent is not voluntary where it is the result of official coercion, intimidation or deception.  
Graf
, 265 Ill. App. 3d at 750, 638 N.E.2d at 1184.

Here, in the case at hand, the trial court specifically found that Balma did not use any threats or put any pressure on Perez to consent to the search.  From our review, we find the trial court's factual determinations are clearly supported by the record.

From the tape, it is clear that Perez sometimes had difficulty understanding Balma's questions.  However, the tape also shows that Perez was capable of understanding English and gave responsive answers to most of Balma's questions, albeit after the questions were rephrased.  Most importantly, the tape shows that Perez answered affirmatively when Balma twice asked him whether it was okay for the officer to look in the truck.  At the suppression hearing, Perez did not say he had any difficulty understanding Balma's questions.  In fact, Perez did testify that, after he told Balma he could look in the truck, he never changed his mind.  Also, Perez admitted he never told Balma to stop searching the vehicle.   From our review of the tape and Perez's testimony at the suppression hearing, we find the trial court correctly determined that Perez voluntarily consented to the search of the vehicle.  

II.  DIAZ'S ADDITIONAL ARGUMENTS

A.  STANDING

Because we have found the stop and search of Perez's truck to be proper, there is no need for this court to review Diaz's argument that the trial court erred when it determined Diaz lacked standing to challenge the search of the vehicle.  

B.  EXCESSIVE SENTENCE

The record clearly shows the State and the defendants presented a sentencing agreement to the court.  As part of the agreement, the State gave up its right to impose a mandatory street value fine.  Also, as part of the agreement, the defendants waived the preparation of a presentence investigation report.  

Section 5--3--1 of the Unified Code of Corrections (Code) provides that a "defendant shall not be sentenced for a felony before a written presentence report of investigation is presented to and considered by the court."  730 ILCS 5/5--3--1 (West 1994).  However, the statute also provides that the trial court may dispense with this statutory requirement when both parties agree to the imposition of a specific sentence and a finding is made for the record regarding the defendant's criminal history.  730 ILCS 5/5--3--1 (West 1994); 
People v. Harris
, 105 Ill. 2d 290, 300, 473 N.E.2d 1291, 1296 (1985).  By its very terms, section 5--3--1 applies whenever a defendant is sentenced for a felony, whether it follows a guilty plea or is after a trial.  See 
Harris
, 105 Ill. 2d at 299, 473 N.E.2d at 1295.

Here, we find that Diaz waived the preparation of a presentence investigation report and agreed to a specific sentence.  Also, the record reveals the trial court was informed that Diaz had no prior criminal record.  As long as the trial court is aware of the defendant's criminal history, it has complied with the statutory requirements and may accept the parties' sentencing agreement.  
Cf.
 
People v. Olivarez
, 279 Ill. App. 3d 90, 100, 664 N.E.2d 156, 162-63 (1996); 
People v. Evans
, 273 Ill. App. 3d 252, 255-56, 651 N.E.2d 1143, 1145-46 (1994).  

We hold that, where the trial court complies with the requirements of section 5--3--1 of the Code and imposes the exact  sentence the defendant has agreed to accept, the defendant cannot challenge the sentence as being excessive.  See 
People v. Evans
, 174 Ill. 2d 320, 327, 673 N.E.2d 244, 248 (1996) (a defendant's effort to unilaterally reduce his sentence while holding the State to its part of the bargain cannot be condoned); 
People v. Catron
, 285 Ill. App. 3d 36, 37, 674 N.E.2d 141, 142 (1996) (by entering into a sentencing agreement, a defendant implicitly agrees that the agreed-upon sentence cannot be excessive); 
People v. Wendt
, 283 Ill. App. 3d 947, 951-52, 670 N.E.2d 1230, 1233 (1996) (a defendant may not challenge an agreed sentence where the trial court exercised no discretion in imposing sentence).  

For the reasons stated, the judgment of the circuit court of Bureau County is affirmed in both cases.

Affirmed.

LYTTON, P.J., and SLATER, J., concur.