THE PEOPLE *ex rel.* GEORGE H. RYAN, Secretary of State, Plaintiff-Appellee, v. THE VILLAGE OF HANOVER PARK *et al.*, Defendants-Appellants (Metro Counties of Illinois, Plaintiff-Intervenor).

First District (1st Division)   Nos. 1—98—3752, 1—98—3851, 1—98—3852 cons.

---

Opinion filed December 30, 1999.

Everette M. Hill, Jr., of Klein, Thorpe & Jenkins, Ltd., and Jack M. Siegel, of Altheimer & Gray, and Vincent Cainkar and Heather R. Sloan, both of Louis F. Cainkar, Ltd., all of Chicago, and Norman E. Samelson, of Samelson & Payne, of Des Plaines, for appellants.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Erik G. Light, Assistant Attorney General, of counsel), and William F. Conlon and Peter J. Tarsney, both of Sidley & Austin, of Chicago, for appellee.

JUSTICE RAKOWSKI delivered the opinion of the court

The Illinois Vehicle Code (Code) (625 ILCS 5/1—100 *et seq.* (West 1998)) and certain supreme court rules provide a comprehensive scheme for uniformly enforcing Illinois traffic laws under chapter 11 of the Code. This scheme provides that, upon an arresting officer issuing a uniform citation, the traffic offense is then adjudicated in circuit court. Where adjudication of a traffic offense results in a conviction, the clerk of the court reports the conviction to the Secretary of State so that he may monitor and maintain accurate records of repeat offenders and provide a basis for suspending or revoking drivers' licenses. Defendants Village of Hanover Park, Village of Northfield, Village of Schaumburg, Village of Kenilworth, and Village of McCook enacted alternative traffic programs that allow the traffic offender to pay a

settlement fee in lieu of court adjudication. This process eliminates the possibility of the offender receiving a conviction for the offense and having the conviction reported to the Secretary of State. The question raised in this *quo warranto* action is whether the alternative traffic programs are inconsistent with the state scheme to the extent that defendants were without authority to enact such programs. Because we find these programs disrupt the uniform enforcement of the Code's traffic provisions in chapter 11, we conclude that defendants lack the authority to implement such programs. We therefore affirm the trial court's judgment on the pleadings in favor of the People of Illinois (People).

## I. Background

The Attorney General initiated this *quo warranto* action on behalf of the People on the relation of George H. Ryan (then Secretary of State) against defendants. Metro Counties of Illinois, a nonprofit Illinois corporation consisting of 12 of the most populous counties in Illinois, intervened as an intervenor-plaintiff.[1] Granting the People's motion for judgment on the pleadings pursuant to section 2—615 of the Illinois Code of Civil Procedure (735 ILCS 5/2—615 (West 1998)), the circuit court found the ordinances implementing alternative traffic programs inconsistent with the laws of Illinois and therefore invalid. The court enjoined defendants from further administering the ordinances at issue. We have jurisdiction under Supreme Court Rule 301. 155 Ill. 2d R. 301.

### A. *The Code Enforcement Scheme*

Section 16—102 of the Code directs the police to patrol the public highways and make arrests for violations of the Code. 625 ILCS 5/16—102 (West 1998); see 625 ILCS 5/16—101 (West 1998) (providing that section 16—102, among others, shall be applicable to the enforcement of the entire Code); see also 65 ILCS 5/11—80—1 (West 1998) (municipalities' ability to regulate the use of streets under section 11—80—2 of the Illinois Municipal Code (65 ILCS 5/11—80—2 (West 1998)) is subject to the provisions of the Code). Upon arrest of a traffic offender, the officer issues a citation on a standard form called a uniform citation and complaint (uniform citation) pursuant to Supreme Court Rule 552 (134 Ill. 2d R. 552) and section 111—3 of the Illinois Code of Criminal Procedure of 1963 (725 ILCS 5/111—3 (West

---

[1]Those counties are Cook, De Kalb, Du Page, Kane, Lake, Madison, McHenry, St. Clair, Tazewell, Will, Kendall, and Winnebago.

1998)).[2] Supreme Court Rule 552 directs the arresting officer to complete the uniform citation and, within 48 hours of the arrest, transmit it to the clerk of the circuit court of the county in which the violation occurred. At that point, the uniform citation serves as the complaint against the offender and is assigned a case number. 134 Ill. 2d R. 552; 725 ILCS 5/111—3 (West 1998). The court adjudicates the case, and where adjudication leads to a conviction, the clerk of the court reports the conviction to the Secretary of State in accord with Supreme Court Rule 552 and section 6—204 of the Code. See 134 Ill. 2d R. 552; 625 ILCS 5/6—204 (West 1998). The Secretary of State is charged with, *inter alia*, the duty of maintaining records of Code convictions (625 ILCS 5/6—117(c) (West 1998)) and revoking, canceling, or suspending licenses of those individuals whose traffic violations evidence an unfitness to safely operate motor vehicles (625 ILCS 5/6—204(a) (West 1998)).

## B. Defendants' Alternative Traffic Programs

For purposes of discussion, the following is a generalization of all of the defendants' programs, although it must be noted there are varying distinctions between each individual program. Generally, defendants' ordinances allow municipal police officers to issue a "P-ticket" for certain traffic offenses rather than a uniform citation. Compare Village of Hanover Park Municipal Code § 17.17.107 (June 16, 1994); Village of Schaumburg Municipal Code § 37.07 (April 24, 1984); Village of McCook Municipal Code § 10—17—2 (May 2, 1990); Village of Northfield Municipal Code § 13—71 (June 27, 1989); Village of Kenilworth Municipal Code § 22—35 (May 9, 1994), with 725 ILCS 5/111—3 (West 1998); 134 Ill. 2d R. 552. The offender has an opportunity to settle or compromise the P-ticket within a specified period by paying a fee to the village. If the offender settles, he is relieved of liability without triggering circuit court involvement. If the offender fails to accept the municipality's offer, however, the municipal authorities then file a complaint in circuit court alleging the traffic offense.

## I. Standard of Review

■ The trial court granted the People's motion for judgment on the pleadings pursuant to section 2—615(e) of the Illinois Code of Civil Procedure. 735 ILCS 5/2—615(e) (West 1998). We review that determination *de novo*. *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 189 (1997). We must interpret all well-pled allegations and supporting documents in the light most favorable to the nonmoving party. *In re*

---

[2]Supreme Court Rule 552 provides that uniform citations shall be adapted for municipal use. 134 Ill. 2d R. 552.

*Chicago Flood Litigation,* 176 Ill. 2d at 189. Furthermore, in our review, no conclusions of law or factual conclusions unsupported by allegations of specific facts are admitted. *Small v. Sussman,* 306 Ill. App. 3d 639, 642 (1999).

## II. Allegations Satisfy the Quo Warranto Act

Defendants contend that the Attorney General failed to allege sufficient facts for a *quo warranto* action. We disagree.

■ Section 18—101 of the Code of Civil Procedure (Quo Warranto Act or Act) (735 ILCS 5/18—101 (West 1998)) provides the grounds upon which a *quo warranto* action may be brought. Subpart (5) of that section states that a *quo warranto* action may be brought where "[a]ny corporation does or omits to do any act which amounts to a surrender or forfeiture of its rights and privileges as a corporation, or *exercises powers not conferred by law.*" (Emphasis added.) 735 ILCS 5/18—101(5) (West 1998). Reference to corporation in the Act has been deemed to include municipal corporations. *People ex rel. Ryan v. City of West Chicago,* 216 Ill. App. 3d 683, 690 (1991).

The pleading requirements under the Act are extremely liberal. "It is well established that a plaintiff in a *quo warranto* action is not required to allege any facts in the complaint showing the challenged acts are unlawful; it is enough to, in general terms, allege the defendant exercised the claimed rights without authority." *People ex rel. Daley v. Datacom Systems Corp.,* 146 Ill. 2d 1, 35-36 (1991); accord *City of West Chicago,* 216 Ill. App. 3d at 687. Because the pleading requirements are so liberal, and because defendants bear the burden of proof, courts must exercise great care when dismissing *quo warranto* actions at the pleading stage. *Datacom Systems Corp.,* 146 Ill. 2d at 36.

The complaint in this case alleges sufficient facts to establish a *quo warranto* action. Each of the five counts in the complaint alleges substantially the same facts. Count I against Village of Hanover Park is demonstrative of the other counts. It provides:

"7. Pursuant to Section 11—208 of the Illinois Vehicle Code (625 ILCS 5/11—208), Village of Hanover Park, is authorized to regulate the vehicular use of its streets and highways.

8. Pursuant to Rule 552 of the Supreme Court of Illinois, defendant, Village of Hanover Park, is required to issue a Uniform Citation and Complaint for cases which involve a traffic offense. ***

9. Defendant, Village of Hanover Park, has established by municipal ordinance an alternative traffic enforcement program for certain traffic offenses. ***

10. Defendant's alternative traffic enforcement program allows the issuance of an administrative ticket for certain traffic offenses rather than issuing a Uniform Citation and Complaint. ***

11. As a result of the alternative traffic enforcement program, guilty pleas and findings for traffic offenses are not reported to the Secretary of State as required by Illinois Supreme Court Rule 552 and Section 2—604 of the Vehicle Code (625 ILCS 5/2—604).

12. Defendant, Village of Hanover Park, is exercising an alleged right to conduct the alternative traffic enforcement program without authority."

■ Considering the above allegations, the complaint easily satisfies subpart (5) of section 18—101, since it alleges that certain municipal corporations are exercising powers not conferred by law. Specifically, the complaint alleges that defendants have instituted alternative traffic enforcement programs that are not authorized by law and are contrary to the Code and its supporting provisions. As such, the allegations of the complaint satisfy the Act.

Defendants, however, contend that the complaint impermissibly attempts to challenge the official acts of public officers. Specifically, defendants argue that the instant *quo warranto* proceeding is an effort to attack the legality of the official acts of the village boards in enacting the alternative traffic enforcement schemes. Again, we disagree.

Defendants are correct in that a *quo warranto* action "is not a proper proceeding to test the legality of the official acts of public officers." *People ex rel. Citizens for a Better Bloomingdale v. Village of Bloomingdale*, 37 Ill. App. 3d 583, 586 (1976). "The only proper scope of [a] quo warranto proceeding is to challenge the authority to act, as distinguished from the manner of exercising authority." *People ex rel. Citizens for a Better Bloomingdale*, 37 Ill. App. 3d at 586. The allegations in this case, however, are not challenging the manner in which defendants are executing specific provisions of the Code or any other law. Rather, the complaint challenges the defendants' purported right or authority under the Code to implement an alternative traffic scheme that diverges from applying the Code uniformly throughout the state. Simply put, the question here is whether Illinois law authorized defendants to enact alternative traffic enforcement programs. This is a proper challenge under the Act. Furthermore, the cases defendants cite in support of their argument are distinguishable and consequently unpersuasive. See *People ex rel. Chillicothe Township v. Board of Review*, 19 Ill. 2d 424, 425-28 (1960) (*quo warranto* complaint improperly brought to challenge board of review's increase in property taxes and to challenge certain actions of *de facto* officials); *People ex rel. Citizens for a Better Bloomingdale*, 37 Ill. App. 3d at 584-87 (*quo warranto* improperly brought to challenge the wisdom of village officials' decision to annex additional land to the village); *People ex rel. Hettleman v. Board of County Commissioners*, 102 Ill. App. 2d 310,

311 (1968) (*quo warranto* improperly brought to challenge commissioners' official acts in defraying the cost of moving approximately 140,000 volumes from law library). Thus, the complaint is sufficient.

### III. Proper Parties under the Quo Warranto Act

■ Defendants next contend that Mr. Ryan does not have standing to maintain this *quo warranto* action. Contrary to defendants' efforts, however, the plain and unambiguous language leads us to conclude that the proper parties brought this action and that there are no standing problems relating to Mr. Ryan.

· Section 18—102 provides in pertinent part:

"The [*quo warranto*] proceeding shall be brought in the name of the People of the State of Illinois by the Attorney General or State's Attorney of the proper county, *either of his or her own accord or at the instance of any individual relator*; or by any citizen having an interest in the question on his or her own relation, when he or she has requested the Attorney General and State's Attorney to bring the same, and the Attorney General and State's Attorney have refused or failed to do so \*\*\*." (Emphasis added.) 735 ILCS 5/18—102 (West 1998).

Defendants' best argument distorts the requirements of the above provision. They argue that "[w]hen as here, no private interests or claim are involved, it is only the State's Attorney or the Attorney General who has standing to bring this action on their own relation." Contrary to this contention, the emphasized portion of the above section clearly permits the Attorney General or State's Attorney to bring a *quo warranto* action on his or her own relation or at the *insistence of any individual relator*. 735 ILCS 5/18—102 (West 1998). Clearly, Mr. Ryan qualifies as *any relator*, and it is equally clear that the Attorney General in this case was authorized to initiate this action on behalf of the People based on the information Mr. Ryan provided regarding defendants' exercise of authority. Defendants' focus on the latter portion of section 18—102, which refers to parties bringing a *quo warranto* action based on harm to private interests, is patently misplaced and without merit. There are no allegations of private harm; rather, this action addresses a public interest, namely, allegations that defendants' ordinances are not sanctioned by state law.

Moreover, the cases defendants rely on are inapposite and therefore provide no persuasive support. Those cases correctly observe that the Attorney General and State's Attorney have the sole authority to *bring* a *quo warranto* action on behalf of a public interest; they, however, do not hold that a relator such as Mr. Ryan cannot urge the Attorney General or State's Attorney to *bring* such an action. See *Edgewood Park No. 2 Homeowners Ass'n v. Countryside Sanitary*

*District*, 42 Ill. 2d 241, 245 (1969) (complaint could not be construed as one under the Quo Warranto Act where it was not brought in the name of the People of the State of Illinois and was not brought by the specified officials); *People ex rel. Freeport Fire Protection District v. City of Freeport*, 90 Ill. App. 3d 112, 113 (1980) (Attorney General or State's Attorney has standing to apply for a writ of *quo warranto* as representative of the People, and in matters of purely public interest, their discretion is absolute as to whether they shall ask the court to issue the writ); *People ex rel. Brooks v. Village of Lisle*, 24 Ill. App. 3d 432, 434-35 (1974) (holding that a municipality, as a representative of its citizens, did not have standing to initiate *quo warranto* proceedings based upon a public interest and that no private interest was present to justify a *quo warranto* complaint being brought by the municipality as a citizen having an interest in the question on its own relation). Therefore, we conclude the Attorney General properly brought this *quo warranto* action on the relation of Mr. Ryan.

### IV. Alternative Traffic Enforcement Programs and the Vehicle Code

Defendants contend the trial court erred when it found they lack the authority to enact and enforce alternative traffic enforcement programs. The specific issue presented by the parties is whether defendants are authorized by law to enforce the rules of the road provided in chapter 11 of the Code through alternative traffic enforcement programs. Because we find that these programs disrupt the uniform enforcement of the Code's rules of the road provided in chapter 11 by eliminating the judicial process and reports of convictions to the Secretary of State, we conclude the programs violate the spirit and intent of the Code and defendants were without authority to enact them. We note that, because the parties' arguments focus on moving traffic violations enumerated under chapter 11 of the Code, our decision has the same focus and expresses no opinion on whether defendants have the authority to implement alternative enforcement programs for other chapters of the Code.

Ordinances from both non-home-rule and home rule municipalities are challenged in this case. Although home rule municipalities enjoy broad powers, non-home-rule units are restrained by Dillon's Rule. Under this rule, non-home-rule municipalities may only exercise powers granted by law or by the Illinois Constitution (see Ill. Const. 1970, art. VII, § 7). See, *e.g.*, 65 ILCS 5/1—1—10 (West 1998) (granting municipalities with the authority to pass ordinances and rules that are proper and necessary to carry into effect the powers granted to them). To that end, "municipalities possess only those powers

expressly granted, powers incident to those expressly granted, and powers indispensable to the accomplishment of the declared objects and purposes of the municipal corporation." *Pesticide Public Policy Foundation v. Village of Wauconda*, 117 Ill. 2d 107, 112 (1987); accord *Village of Wauconda v. Hutton*, 291 Ill. App. 3d 1058, 1060 (1997); *Village of Mundelein v. Hartnett*, 117 Ill. App. 3d 1011, 1015 (1983). Municipalities "cannot *** adopt ordinances under a general grant of power which infringe upon the spirit of the State law or are repugnant to the general policy of the State." *Hartnett*, 117 Ill. App. 3d at 1015. "[W]here there is a conflict between a statute and an ordinance, the ordinance must give way." *Hartnett*, 117 Ill. App. 3d at 1015.

■ As to home rule authorities, section 6 of article VII of the 1970 Illinois Constitution (Ill. Const. 1970, art. VII, § 6) confers to them the ability to exercise and perform concurrently with the state any power or function to the extent that the General Assembly does not specifically limit such concurrent exercise of authority or declares the state's exercise of power to be exclusive. Ill. Const. 1970, art. VII, § 6(i). Our supreme court recently referred to and quoted the comments of the Committee on Local Government in explaining the scope of home rule authority:

> "[T]he legislature can 'permit concurrent local legislation, but only within limits that are consistent with the state statutory scheme. Surely if the state is permitted to exclude local governments from areas where the state has acted, it also should be able to restrict the nature and extent of concurrent local activity.' [Citations.]" *City of Chicago v. Roman*, 184 Ill. 2d 504, 519 (1998).

To limit home rule powers, the legislature must do so by expressly stating that the "statute constitutes a limitation on the power of home rule units to enact ordinances that are contrary to or inconsistent with the statute." *City of Chicago*, 184 Ill. 2d at 520.

■ Under chapter 11 of the Code, however, home rule designation does not enhance a municipality's ability to enact ordinances on the same subjects, since the same limitations of power apply to both home rule and non-home-rule entities. While the legislature has not preempted the field of traffic regulation (see *Village of Cherry Valley v. Schuelke*, 46 Ill. App. 3d 91, 93-94 (1977)), all municipalities are limited to enacting traffic ordinances that are consistent with the provisions of chapter 11 of the Code and that do not upset the uniform enforcement of those provisions throughout the state. Section 11—207 of chapter 11 provides in pertinent part:

> "The provisions of this Chapter shall be applicable and *uniform throughout this State* and *in all political subdivisions and municipalities* therein, and no local authority shall *enact or enforce any*

*ordinance rule or regulation* in conflict with the provisions of this Chapter unless expressly authorized herein. Local authorities may, however, adopt additional traffic regulations which are not in conflict with the provisions of this Chapter \*\*\*." (Emphasis added.) 625 ILCS 5/11—207 (West 1998).

Similarly, section 11—208.1 also mandates uniform enforcement of the provisions of chapter 11 as well as rules and regulations of other state offices or agencies that were promulgated pursuant to the Code. Section 11—208.1 provides: "The provisions of this Chapter of this Act, as amended, and the rules and regulations promulgated thereunder by any State Officer, Office, Agency, Department or Commission, shall be applicable and uniformly applied and enforced throughout this State, in all other political subdivisions and in all units of local government." 625 ILCS 5/11—208.1 (West 1998). Limiting the power of home rule units specifically, section 11—208.2 states: "The provisions of this Chapter of this Act limit the authority of home rule units to adopt local police regulations inconsistent herewith except pursuant to Sections 11—208 and 11—209 of this Chapter of this Act." 625 ILCS 5/11—208.2 (West 1998). To determine whether there is conflict between municipal ordinances and state law, we look to whether the ordinance infringes upon the spirit of the state law or is repugnant to the policy of the State. *City of De Kalb v. White*, 227 Ill. App. 3d 328, 330 (1992).

Generally speaking, under the ordinances in this case, a police officer may issue a P-ticket for certain traffic offenses rather than a uniform citation pursuant to section 111—3 of the Illinois Code of Criminal Procedure and Supreme Court Rule 552. See 725 ILCS 5/111—3 (West 1998); 134 Ill. 2d R. 552. Upon being issued a P-ticket, the offender has the opportunity to settle or compromise the ticket within a specified number of days by paying a fee to the village. If the offender settles, he is relieved of liability without circuit court involvement. However, if the offender fails to accept the municipality's offer, the municipal authorities then file a complaint in circuit court alleging the traffic offense.

However, in areas of the state without alternative traffic programs, a police officer patrolling the public highways is directed to make arrests for violations of the Code. See 625 ILCS 5/16—101 (West 1998) (providing that section 16—102, among others, shall be applicable to the enforcement of this entire Code); see also 65 ILCS 5/11—80—1 (West 1998) (municipalities' ability to regulate the use of streets under section 11—80—2 of the Illinois Municipal Code is subject to the provisions of the Vehicle Code). Supreme Court Rule 552 directs the arresting officer to complete the uniform citation and transmit it to the

circuit court where it serves as the complaint against the offender. 134 Ill. 2d R. 552; 725 ILCS 5/111—3 (West 1998). The court in turn adjudicates the offense. Where adjudication of the offense results in a conviction, the clerk of the court must transmit the "Report of Conviction" portion of the uniform citation to the Secretary of State. 134 Ill. 2d R. 552; 625 ILCS 5/6—204(a)(1) (West 1998). Under the Code, a conviction is "[a] final adjudication of guilty by a court of competent jurisdiction either after a bench trial, trial by jury, plea of guilty, order of forfeiture, or default." 625 ILCS 5/6—100 (West 1998).

Although the Code expressly grants municipalities the power to administratively adjudicate certain offenses, such as standing and parking violations (see 625 ILCS 5/11—208.3 (West 1998)), it is devoid of any authorization for the programs that administratively adjudicate violations of chapter 11. Consequently, to be valid, the alternative traffic programs must comport with the provisions mandating uniformity and consistency that were discussed above.

■ The lack of uniformity and consistency between the ordinances and the Code is patent. As to uniformity, even though chapter 11 specifically mandates that it shall be uniformly enforced throughout the state, application of these ordinances institutes an enforcement scheme different from the one contemplated by the Code and its attendant provisions. In lieu of a uniform citation being prepared after a police officer arrests an offender, under defendants' ordinances, the offender is given an offer to settle the matter. This gives the offender an opportunity to circumvent the potential consequences of committing the offense, namely, a chance to avoid an adjudication in the circuit court, a finding of guilty, and a guilty finding being reported to the Secretary of State. In an area without these ordinances, offenders cannot make this election, but are subject to the court upon being issued a uniform citation for the violation. As such, it is apparent that these programs fail to implement the Code as mandated under sections 11—207, 11—208.1, and 11—208.2. Consequently, the enforcement of the ordinances cannot be said to be uniform with enforcement of chapter 11 in areas of the state without these programs. 625 ILCS 5/11—207, 11—208.1, 11—208.2 (West 1998). Moreover, it follows that the lack of uniformity makes these ordinances inconsistent with the policy of uniformity expressed in chapter 11 of the Code.

By allowing offenders to circumvent the court, the alternative traffic programs derail one of the Secretary of State's most important duties—monitoring traffic offenders through reports of convictions. "The Secretary [of State] has broad authority to administer the State's laws governing the conduct of drivers on the roads, and is statutorily directed to observe, administer and enforce the provisions of the

Code." *People v. Pine*, 129 Ill. 2d 88, 96 (1989). His authority "includes the *exclusive* right 'to grant, issue, deny, cancel, suspend and revoke driving privileges, drivers' licenses and restricted driving permits.' " (Emphasis added.) *Pine*, 129 Ill. 2d at 96, quoting Ill. Rev. Stat. 1987, ch. 95½, par. 2—101(c). However, the Secretary of State can only effectively execute these *exclusive* duties when traffic offense convictions are reported according to section 6—204 and Supreme Court Rule 552. 625 ILCS 5/6—204 (West 1998). This is clear from a reading of section 6—204(a)(2). That section provides in part:

> "(a) For the purpose of providing to the Secretary of State the records essential to the performance of the Secretary's duties under this Code to cancel, revoke or suspend the driver's license and privilege to drive motor vehicles *** of persons found guilty of *** traffic violations which this Code recognizes as evidence relating to unfitness to safely operate motor vehicles, the following duties are imposed upon public officials:
>
> ***
>
> 2. Whenever any person is convicted of any offense under this Code or similar offenses under a municipal ordinance ***, it shall be the *duty of the clerk of the court in which such conviction is had within 10 days thereafter to forward to the Secretary of State a report of the conviction* and the court may recommend the suspension of the driver's license or permit of the person so convicted." (Emphasis added.) 625 ILCS 5/6—204(a)(2) (West 1998).

As can be seen, the fact defendants' alternative traffic programs do not trigger court adjudications disrupts not only the judiciary's function, but undermines the policies set forth by the legislature regarding the duties of the Secretary of State. In effect, the programs gut any possibility that the Secretary of State can meet his exclusive duties listed above. This effect is clearly contrary to and inconsistent with the Code. Thus, defendants are without authority to enact and maintain such alternative traffic programs as they pertain to chapter 11 of the Code.

Nevertheless, both home rule and non-home-rule defendants make several arguments that the alternative traffic schemes are consistent and uniform with the Code. It is worth noting that home rule and non-home-rule defendants filed separate briefs and advance somewhat distinct arguments in support of their positions. However, for purposes of discussion, these arguments are paired with their counterparts where possible so that related contentions are addressed together.

■ First, defendants contend that, because the ordinances follow the Code's provisions verbatim and only alter the penalty for violations, they are therefore consistent with the Code. While it is true that the ordinances track the language of the Code *en haec verba* as it

defines various offenses, they do not *enforce* those provisions as the Code and attendant provisions contemplate. As stated above, the ordinances allow the traffic offender to completely circumvent court involvement by paying a "settlement fee." Clearly, payment of a settlement fee does not amount to court involvement, adjudication of the offense, a conviction, and a report of conviction to the Secretary of State. The very lack of these consequences belies the purpose of the uniformity provisions of chapter 11 and the duties of the Secretary of State.

Nevertheless, defendants direct our attention to *City of De Kalb v. White*, 227 Ill. App. 3d 328 (1992), *Village of Mundelein v. Ollivier*, 93 Ill. App. 3d 324 (1981), *Village of Cherry Valley v. Schuelke*, 46 Ill. App. 3d 91 (1977), *City of Rockford v. Floyd*, 104 Ill. App. 2d 161 (1968), and *City of Highland Park v. Curtis*, 83 Ill. App. 2d 218 (1967), in support of their contentions. Defendants contend these cases clearly show that any difference in penalty does not render the ordinances inconsistent with the Code, and non-home-rule defendants emphasize that the court in *Ollivier* approved a program similar to the ones at issue here. ·

While it is true that the ordinances at issue in *Schuelke, White, Floyd,* and *Curtis* provided different penalties for the same violations provided under the Code, none of the ordinances at issue eliminated court adjudication as the process of enforcing the ordinance. Consequently, none of the ordinances undermined the policies at issue here. Thus, these cases are inapposite to the one *sub judice. Ollivier* is likewise irrelevant, but for different reasons.

In *Ollivier*, the defendant parked her car within the Village of Mundelein, and a village police officer placed a ticket entitled "Notice of Ordinance Violation" on her car. The ticket cited the offense of failing to display a valid village tag but did not specify the ordinance she violated. The ticket indicated that a fine of $25 was to be paid within 10 days from the issuing date and instructed her where to plead guilty and waive trial. It also provided that, before the due date, defendant could mail or personally deliver the amount of the fine to the police department.

The court first held that the ticket did not violate section 1—2—9 of the Municipal Code (Ill. Rev. Stat. 1979, ch. 24, par. 1—2—9). Section 1—2—9 provides that the first process for violations of municipal ordinances shall be a summons or a warrant. The court found that all the ticket amounted to was a "notice" of violation. The court then went on to discuss what defendants here unduly rely on in this case. The court states:

"Nothing in section 1—2—9 of the Municipal Code precludes the

village from utilizing procedures for collecting fines and penalties in lieu of court action. Section 1—2—1 of the Municipal Code (Ill. Rev. Stat. 1979, ch. 24, par. 1—2—1) expressly authorizes municipalities to establish any procedures necessary to carry into effect the powers granted to it. Section 8—11—4 of the Municipal Code (Ill. Rev. Stat. 1979, ch. 24, par. 8—11—4) and section 2—121 of the Illinois Vehicle Code (Ill. Rev. Stat. 1979, ch. 95½, par. 2—121) authorize municipalities to impose vehicle license fees. The 'Notice of Ordinance Violation' issued in this case has been correctly characterized by the village as an administrative procedure used by many units of local government to collect fines and penalties without resort to judicial process, and we reiterate it is not the commencement of court action for the violation of a municipal ordinance." *Ollivier*, 93 Ill. App. 3d at 325.

Although not clearly apparent from the court's discussion in the above excerpt, the provisions upon which the court based its decision are irrelevant to this case and fail to even provide guidance through analogy. While the instant case involves enforcement of Illinois rules of the road for moving violations, the *Ollivier* case involved the village's administrative procedure for enforcing its vehicle licensing requirements. Section 1—2—9 of the Municipal Code did not preclude the village from instituting an administrative procedure for collecting fines or penalties without court action as that provision merely addressed the form of the first process (summons or warrant) for instituting court proceedings relating to municipal ordinance violations. See Ill. Rev. Stat. 1979, ch. 24, par. 1—2—9. Similarly, section 1—2—1 of the Municipal Code was equally devoid of any proscription of the village's administrative collection provisions, but actually supported the action since it authorized municipalities to establish necessary procedures for effectuating powers granted to it. See Ill. Rev. Stat. 1979, ch. 24, par. 1—2—1. Lastly, section 2—121 authorized municipalities to impose licensing fees upon its residents who own vehicles or upon owners of vehicles that are based in the municipality. See Ill. Rev. Stat. 1979, ch. 95½, par. 2—121. As such, it is clear that *Ollivier* is inapposite, considering it does not address the uniform enforcement provisions applicable to chapter 11 of the Code.

■■■ Second, defendants contend the alternative traffic enforcement programs do not circumvent court enforcement of the Code or the Secretary of State's duties to keep records of traffic offenses pursuant to section 6—204 of the Code. Specifically, they point out that court adjudication is triggered by an arrest and that, under their programs, an offender is never arrested. In the same vein, defendants assert that the court's duty to report convictions is not circumvented because issuance of P-tickets never leads to convictions.

To support their "no arrest" argument, defendants direct our attention to authority that defines the term "arrest" as it is used in the Illinois Code of Criminal Procedure. That definition provides that an arrest is "the taking of a person into custody." 725 ILCS 5/102—5 (West 1998); accord *People v. Wipfler*, 37 Ill. App. 3d 400, 403 (1976) (following the definition of the Illinois Code of Criminal Procedure and defining arrest as "the taking into custody of a person, accomplished by either actual restraint of the person or his submission into custody"). Apparently, because issuance of a P-ticket does not require the officer to take the offender into custody, defendants claim arrests do not occur when their ordinances are enforced.

Notwithstanding the above statutory definition of arrest, enforcement of the Code does not require taking the offender into "actual custody." See 155 Ill. 2d R. 526 (providing bail provisions for minor traffic offenses). Furthermore, it is well settled that an arrest requires less than being taken into custody. Recently, this court reiterated that "[a]n arrest occurs when a person's freedom of movement has been restrained by means of physical force or show of authority. [Citation.] In determining whether a person has been arrested, the relevant inquiry is whether a reasonable, innocent person in his situation would conclude that he was not free to leave." *People v. Reed*, 298 Ill. App. 3d 285, 298 (1998). In the context of DUI driving offenses, Illinois courts refer to the same standard while also acknowledging that issuance of a citation in that context is one manner of evidencing an arrest. *People v. Gamblin*, 251 Ill. App. 3d 769, 771 (1993) ("The administration of field sobriety tests and the transportation to a police station are other manners of proof" of an arrest); accord *People v. Brantley*, 248 Ill. App. 3d 580, 582 (1993); *People v. Lewallen*, 247 Ill. App. 3d 350, 353-54 (1993); *People v. Selby*, 241 Ill. App. 3d 80, 83 (1993). Under this definition, being stopped by a municipal police officer for an alleged traffic violation would be considered an arrest, since, more often than not, a reasonable person does not feel that he can leave until issuance of the ticket and permission to leave is given. Consequently, defendants cannot claim that arrests do not occur with issuance of P-tickets nor can they claim that traffic stops do not trigger adherence to Supreme Court Rule 552, requiring the arresting officer to complete the uniform citation and file it in the circuit court within 48 hours.[3] 134 Ill. 2d R. 552; see 725 ILCS 5/111—3 (West 1998) (providing that the uniform citation acts as the complaint

---

[3]We express no opinion on whether an officer must issue a uniform citation every time an arrest occurs for a violation of a traffic rule. That question, which is not before this court, deals with the amount of discretion an officer

against the defendant when it is filed in circuit court); 625 ILCS 5/16—102 (West 1998) ("The State's Attorney of the county in which the violation occurs shall prosecute all violations" unless the violation occurs within a municipality, in which case the municipal attorney may prosecute with written permission from the State's Attorney).

As to defendants' "no conviction" argument, we agree that under the alternative traffic programs, offenders are never convicted. This, however, further exposes the fundamental flaws in their ordinances; despite arrests occurring for violations of the rules of the road and fees being paid, offenders are never subjected to circuit court involvement or convictions after being issued P-tickets. As seen above, the latter result completely precludes the Secretary of State from executing its exclusive duties.

■■■ Non-home-rule defendants also contend that issuance of P-tickets is not substantively different than a police officer issuing a warning instead of a uniform citation. They argue that, just like it is within the officer's discretion to "warn" the offender, it is also within his discretion to issue a P-ticket instead of a uniform citation. We agree that the ultimate effect of issuing a P-ticket is the same as a warning since the offender does not have to go to court and potentially be convicted of an offense. However, we disagree with the contention that there is no substantive difference between the two scenarios.

The authority for issuing a P-ticket is the crucial distinction. When a police officer issues a warning in lieu of a uniform citation, he is exercising his discretion to not enforce chapter 11 of the Code. On the other hand, once a police officer elects to issue a P-ticket, he is following and enforcing the municipality's traffic ordinance.

■■■ Lastly, defendants contend that many of the violations for which P-tickets are issued would be adjudicated by court ordered supervision. Defendants argue that, because many court orders of supervision are not required to be reported to the Secretary of State, the alternative ticket programs, in reality, do not upset the reporting requirements in section 6—204 of the Code and Rule 552 anymore than an order of supervision does.

The flaw in defendants argument is that, unlike defendants alternative traffic programs, supervision is authorized by Illinois statute, that it is the province of the legislature to determine which orders of supervision must be reported to the Secretary of State, and that municipalities are without such power. Further, defendants assume that every judge that would be presented with a P-ticket-type violation

---

has in executing the law. In contrast, when an officer issues a P-ticket, he gleans his authority to do so from the municipality's ordinance.

would automatically order supervision. This, however is not the case. Court-ordered supervision is not automatically awarded for certain traffic offenses, but is determined on a case-by-case basis pursuant to section 5—6—1(c) of the Unified Code of Corrections, which delineates various factors for the trial court judge to consider in determining whether supervision should be ordered. 730 ILCS 5/5—6—1(c) (West 1998). As such, defendants' argument is unpersuasive.

Having found that defendants' alternative traffic programs disrupt the uniform enforcement of the Code's rules of the road in chapter 11 and are thus inconsistent with those provisions, we conclude that defendants were without authority to enact ordinances providing such programs. We note in closing that the legislature recently added a provision to the Illinois Municipal Code that limits home rule municipalities' ability to institute programs like the ones at issue in this case. That provision, section 1—2.1—2, provides that home rule municipalities may enact ordinances providing an administrative adjudication system to the extent permitted by statute and the Illinois Constitution except for "any offense under the Illinois Vehicle Code or a similar offense that is a traffic regulation governing the movement of vehicles and except for any reportable offense under Section 6—204 of the Illinois Vehicle Code." 65 ILCS 5/1—2.1—2 (West 1998); see 65 ILCS 5/1—2.1—1 (West 1998) (applying section 1—2.1—2 only to home rule municipalities); 65 ILCS 5/1—2.1—9 (West 1998) (limiting the effect of section 1—2.1—2 on existing administrative adjudication systems to the extent that they were authorized by state law). As can be seen, that provision, which was effective January 1, 1998, reaches beyond our holding as it applies to home rule municipalities by precluding home rule units from providing alternative traffic programs for *all violations* enumerated in the Code as well as *all* offenses that are reportable to the Secretary of State. While arguably section 1—2.1—2 might have provided guidance as to the legislature's intent prior to its enactment, as can be seen from our analysis, however, there was no real ambiguity encountered in our review of the interaction between the uniform enforcement provisions of chapter 11 of the Code and certain other provisions in the Code and supreme court rules. As such, we did not endeavor, nor were we asked, to determine whether section 1—2.1—2 was a clarification of or a substantive change to the law. See *Nelson v. Industrial Comm'n*, 305 Ill. App. 3d 651, 654 (1999) ("[a] material change in the language of an unambiguous statute creates a presumption that the amendment was intended to change the law" and such presumption may only be rebutted by evidence that the amendment was only intended to interpret the act).

## V. Conclusion

For the reasons stated above, we affirm the judgment of the circuit court.

Affirmed.

O'MARA FROSSARD, P.J., and GALLAGHER, J., concur.