THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEVE A. GILBERT, Defendant-Appellant.

Fourth District    No. 4—02—0774

Argued February 18, 2004.—Opinion filed May 4, 2004.—Rehearing denied May 28, 2004.

Daniel D. Yuhas and Susan M. Wilham (argued), both of State Appellate Defender's Office, of Springfield, for appellant.

John C. Piland, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Denise M. Ambrose (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COOK delivered the opinion of the court:

In November 2001, after a remand, defendant, Steve A. Gilbert,

filed a motion to suppress, which the trial court heard and denied on July 1, 2002, at which time the court also reinstated defendant's conviction and sentence and discharged him from probation. Defendant appeals, arguing the court erred in denying his motion to suppress. We agree and reverse.

## I. BACKGROUND

On December 24, 1998, defendant was arrested and charged with possession of a controlled substance, less than 15 grams of cocaine (720 ILCS 570/402(c) (West 1998)). On March 9, 1999, a jury convicted defendant, and on May 10, 1999, the trial court sentenced him to 24 months' conditional probation. While on probation, there was a dispute as to whether defendant had failed a drug test, and the court revoked his probation and resentenced him to an additional 24 months' probation on October 26, 1999.

Defendant appealed both his underlying conviction for possession (No. 4—99—0445) and also the revocation of probation (No. 4—99—0915). On August 17, 2001, this court reversed the conviction due to ineffective assistance of counsel. *People v. Gilbert*, No. 4—99—0445 (August 17, 2001) (unpublished order under Supreme Court Rule 23). We remanded the case to the trial court so that defense counsel could file a motion to suppress. On October 16, 2001, this court also vacated the revocation of defendant's probation, since the trial court had no jurisdiction after the sentence was reversed. *People v. Gilbert*, No. 4—99—0915 (October 16, 2001) (unpublished order under Supreme Court Rule 23).

On November 7, 2001, defendant filed a motion to suppress. At the hearing on the motion on July 2, 2002, Officer Brian Gallagher of the Champaign police department testified that he was on "directed patrol for narcotics investigation" in the north district of Champaign on the night of December 24, 1998. He stated that he observed defendant's car parked on the side of the road with only the driver in it and the engine running. Gallagher did not see anyone enter or exit defendant's vehicle and only observed the vehicle for about 30 seconds as he drove past. However, Gallagher testified that this was a high drug-activity area, and although he could no longer recall the address of the particular house defendant was parked in front of, or whether it was a drug house, he stated that he was sure that defendant's car was parked near a suspected drug house.

Having worked in the north end of Champaign for several years, Gallagher had developed a pattern of drug-purchasing behavior based upon his own observations:

"There would be a pattern where people would park their cars. A

driver would most likely stay in the car. If they had a passenger, the passenger would exit the car, purchase narcotics, get back in the car and leave, and that would be done within a 10-minute, 15-minute period of time, a very quick transaction. That was the most significant pattern."

Based upon this pattern and his observation of defendant parked in his car with the engine running, Gallagher formed the opinion that defendant was buying crack cocaine.

Gallagher then parked his car in an area where he knew defendant would have to drive past to leave the neighborhood and waited for defendant to approach. After waiting for approximately two minutes, he saw defendant drive by with two additional occupants in the vehicle. When he observed that the right taillight of defendant's car was not operational, he pulled defendant over. He approached defendant, asked him for his driver's license and proof of insurance, and informed him why he had been stopped. Gallagher stated that he saw nothing suspicious inside defendant's car, he did not smell any suspicious odors, and he noted nothing suspicious about defendant's or either of the passengers' behavior. Nonetheless, Gallagher immediately called for a canine unit upon returning to his car to run a license and warrant check. In addition to running a license and warrant check on defendant, Gallagher also ran warrant checks on both of the passengers in the car, which he stated quite often causes a time delay.

After about three minutes, Officer Doug Martin arrived on the scene with a canine unit. Gallagher spoke briefly to Martin and described the situation to him. Martin then walked his canine around defendant's vehicle. While Gallagher was writing out a warning ticket for the taillight violation, Martin returned to Gallagher's squad car and informed him that the canine had alerted to the presence of drugs within the vehicle.

Gallagher completed the warning ticket for the taillight violation, then exited his car and approached defendant's vehicle. He informed defendant that the canine had alerted on the vehicle and asked him to step outside the car. Defendant complied, and Gallagher took him to the rear of the vehicle and searched his person. During this search, Gallagher found several rocks of what he suspected was crack cocaine in defendant's rear pocket.

The trial court found that the police had probable cause to stop the vehicle initially, and after the dog had alerted, probable cause to conduct a search of the vehicle and passengers. The entire encounter took about 10 minutes, which the trial court said is about what a person would expect for a traffic stop, so no delay was caused by calling in the canine. The court then determined that because of Gallagh-

er's experience and his observations, he had a reasonable suspicion of criminal activity supporting his decision to bring in a canine unit. Because of this, the court denied the motion to suppress. The court then held that because the motion to suppress had been denied, the language in the order from this court reversing and remanding the cause, "[w]e also find that were such a motion not granted, the evidence was sufficient to convict [defendant] beyond a reasonable doubt," meant a new trial was not necessary and upheld the result of the original trial convicting defendant. This appeal followed.

## II. ANALYSIS

Defendant appeals, arguing that the trial court erred when it denied the motion to suppress and that defendant's right to a trial by jury was denied when the court refused to hold a new trial after the original drug possession conviction had been reversed. After a thorough review of the record, we find that the trial court should have granted the motion to suppress.

■ There is no question about the facts in this case. Where no dispute exists as to the facts or witness credibility, the trial court's ruling on a motion to suppress will be reviewed *de novo*. *People v. Bunch*, 207 Ill. 2d 7, 13, 796 N.E.2d 1024, 1028 (2003). A *de novo* standard of review ensures that our courts of review maintain and clarify the legal principles governing vehicle searches. This, in turn, allows our reviewing courts to develop a uniform body of precedent that will enable police officers to determine, before attempting to search a vehicle, what behavior is constitutionally permissible. *In re G.O.*, 191 Ill. 2d 37, 49-50, 727 N.E.2d 1003, 1010 (2000); *Ornelas v. United States*, 517 U.S. 690, 697-98, 134 L. Ed. 2d 911, 919, 116 S. Ct. 1657, 1662 (1996).

On appeal, the State asserts that the determination of the trial court denying the motion to suppress was correct because the search of defendant was valid on two separate grounds: (1) as a search incident to arrest for the traffic violation, citing *People v. Mendez*, 322 Ill. App. 3d 103, 109-10, 749 N.E.2d 391, 397 (2001) (driver who cannot produce driver's license subject to full custodial arrest and search incident to that arrest), and (2) because the police had probable cause to search after the canine alerted on the vehicle. We find neither justification persuasive.

■ First, we are guided by the observation of the United States Supreme Court and the Supreme Court of Illinois that a traffic stop is more analogous to a *Terry* investigative stop (see *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)) than to a formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 439, 82 L. Ed. 2d 317, 334, 104 S. Ct. 3138, 3150 (1984); *People v. Gonzalez*, 204 Ill. 2d 220, 226, 789

N.E.2d 260, 265 (2003). The use of *Terry* principles applies to all traffic stops, including those supported by the higher standard of probable cause. *Gonzalez*, 204 Ill. 2d at 228, 789 N.E.2d at 266. A *Terry* analysis includes a dual inquiry. We must consider (1) whether the officer's action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances that justified the interference in the first place. *Terry*, 392 U.S. at 19-20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879; *Gonzalez*, 204 Ill. 2d at 228, 789 N.E.2d at 266.

■ Here, the vehicle stop was justified because one of the vehicle's taillights was inoperable. 625 ILCS 5/12—201(a) (West 1996). However, we must next determine whether a custodial arrest and subsequent search would be reasonably related in scope to the circumstances that justified the interference in the first place. The State's argument is similar to Justice Thomas's dissent in *People v. Cox*, 202 Ill. 2d 462, 477, 782 N.E.2d 275, 284 (2002), in which he suggests that whenever the police have the statutory right to arrest an individual, they may do so and may also conduct a corresponding search incident to that arrest without violating the fourth amendment. Justice Thomas notes that the police have statutory authority to arrest drivers for any violation of the law, including traffic offenses. See 725 ILCS 5/107—2(1)(c) (West 2000) (police officer may arrest someone when he "has reasonable grounds to believe that the person is committing or has committed an offense"); *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 149 L. Ed. 2d 549, 577, 121 S. Ct. 1536, 1557 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the [f]ourth [a]mendment, arrest the offender"). In the majority opinion in *Cox*, however, the Illinois Supreme Court stated:

> "When a police officer observes a driver commit a traffic violation, the officer is justified in briefly detaining the driver to investigate the violation. [Citations.] The officer may perform some initial inquiries, check the driver's license, and conduct a speedy warrant check. [Citations.] If no further suspicion is aroused in the officer following these inquiries, the traffic stop should go no further. [Citations.] The officer should issue a warning ticket or a citation, as appropriate, and allow the driver to leave. [Citation.]" *Cox*, 202 Ill. 2d at 468, 782 N.E.2d at 279.

Because a traffic stop is only an investigatory seizure and is not a custodial arrest, the detention must " 'be temporary and last no longer than is necessary to effectuate the purpose of the stop.' " *Cox*, 202 Ill. 2d at 467, 782 N.E.2d at 279, quoting *Florida v. Royer*, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 238, 103 S. Ct. 1319, 1325 (1983) (plurality opinion). To allow a full custodial arrest of a driver stopped for a

minor traffic violation without extenuating circumstances is not compatible with the temporary, investigative nature of a *Terry* stop.

■ In this case, other than the canine sniff, which we discuss later, nothing occurred at the traffic stop that would raise the officer's suspicions or would justify a custodial arrest. Gallagher testified that he did not fear for his safety and that nothing was suspicious about the driver's or the passengers' behavior when he stopped the car. He did not observe any violations other than the taillight being broken. We do not consider the facts from the perspective of analytical hindsight but, rather, as they would have been viewed by a reasonable officer confronting them in the performance of his duties. *People v. Day*, 202 Ill. App. 3d 536, 541, 560 N.E.2d 482, 486 (1990). A reasonable officer who did not fear for his safety and/or observe anything more suspicious than a taillight violation would not have made a full custodial arrest.

Perhaps more importantly, the facts do not support a finding that defendant was arrested for the minor traffic violation. The essential elements of arrest are (1) the intent of the police to make the arrest, and (2) the defendant's understanding, based on an objective standard of reasonableness, that he is in fact under arrest. *People v. Johnson*, 159 Ill. 2d 97, 116, 636 N.E.2d 485, 493 (1994). Gallagher wrote defendant a warning ticket, displaying his intent not to make a formal arrest for the traffic violation. See *People ex rel. Ryan v. Village of Hanover Park*, 311 Ill. App. 3d 515, 532, 724 N.E.2d 132, 144 (1999) (police officer has the discretion to issue a warning instead of a uniform citation for traffic violation, which is an election not to enforce the traffic law). Further, a reasonable person, when stopped for a minor traffic violation, would not view himself as being under arrest but merely temporarily stopped. See *Gonzalez*, 204 Ill. 2d at 226, 789 N.E.2d at 265. With neither the police nor the defendant viewing the situation at the time as an arrest for the traffic violation, neither element of an arrest is present, and we must conclude that there was no arrest for the traffic violation.

■ Because the search of defendant was not valid as a search incident to arrest, we next consider whether the canine sniff was proper in creating probable cause to search defendant. We note again that the original stop of the vehicle was justified, so we are only concerned with the second step in the *Terry* analysis, that the police officer's action be reasonably related in scope to the circumstances that justified the interference in the first place. *Terry*, 392 U.S. at 19-20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879; *Gonzalez*, 204 Ill. 2d at 228, 789 N.E.2d at 266. In determining whether police investigation during the course of a traffic stop satisfies *Terry*'s scope requirement, we first

consider whether the investigation is related to the initial justification for the stop. *Gonzalez*, 204 Ill. 2d at 235, 789 N.E.2d at 270. Clearly a canine sniff or any inquiry about drugs is not related in any way to investigating a broken taillight.

When the investigation is not reasonably related to the purpose of the stop, we must next consider whether the law enforcement officer had a reasonable, articulable suspicion that would justify the investigation. *Gonzalez*, 204 Ill. 2d at 235, 789 N.E.2d at 270. The trial court relied heavily upon Gallagher's experience in determining that he had a reasonable suspicion that defendant may have had a controlled substance in the car. While this is certainly one factor to consider, we must also look objectively at what Gallagher actually observed: (1) it was late at night; (2) defendant was in a high drug-sales area; (3) defendant was parked in a car by himself with the motor running for at least a few minutes; and (4) when defendant drove past Officer Gallagher approximately two minutes later, he had an additional two passengers in the car with him. The trial court found that these facts fit into the pattern of drug-purchasing activity Gallagher described during his testimony. We disagree.

Gallagher testified that when people would buy drugs, quite often they would park their cars, a passenger would exit the car, purchase the narcotics, get back into the car and leave, all of this within a short 10- or 15-minute period of time. He did not, however, witness anybody entering or exiting defendant's car while it was parked. He only witnessed the parked car for about 30 seconds as he drove by, not for the 10- or 15-minute period he described in his pattern. It seems fairly evident that Officer Gallagher became suspicious of defendant's parked vehicle because of its location in a high drug-activity area, which does not create a reasonable suspicion under *Terry* standards. *Brown v. Texas*, 443 U.S. 47, 52, 61 L. Ed. 2d 357, 362-63, 99 S. Ct. 2637, 2641 (1979) (location in a high drug-activity neighborhood is not a basis for concluding that a defendant is engaged in criminal conduct when defendant's actions are not unusual). The facts used by an officer to assert a reasonable suspicion are insufficient when they " 'describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures.' " *People v. Ortiz*, 317 Ill. App. 3d 212, 225, 738 N.E.2d 1011, 1021 (2000), quoting *Reid v. Georgia*, 448 U.S. 438, 441, 65 L. Ed. 2d 890, 894, 100 S. Ct. 2752, 2754 (1980). Gallagher could not tell if defendant's car had been parked for a long time, or whether defendant had just started the car and was allowing it to warm up on a cold winter night. While the behavior described in Gallagher's drug-purchasing "pattern" might constitute a reasonable suspicion, he did not observe the more suspicious activity contained in

the pattern, the quick entering and exiting of a suspected drug house that might suggest a drug transaction to an officer with drug-enforcement experience. Instead, he only witnessed the rather innocuous behavior of a person sitting in a parked car with the engine running. The actual observations Gallagher made, even when viewed in totality, constitute nothing more than a vague hunch that defendant may have been involved in possible wrongdoing. See *People v. Caballes*, 207 Ill. 2d 504, 510, 802 N.E.2d 202, 204 (2003).

If there is no reasonable connection to the purpose of the stop or a reasonable articulable suspicion supporting the investigation, we must finally consider whether, in light of all the circumstances and common sense, the investigation impermissibly prolonged the detention or changed the fundamental nature of the stop. *Gonzalez*, 204 Ill. 2d at 235, 789 N.E.2d at 270. In *Cox*, 202 Ill. 2d at 469, 782 N.E.2d at 280-81, the Illinois Supreme Court examined whether a canine sniff was reasonably related in scope to a traffic stop for a registration-light violation. The court concluded that when the officer that made the stop called a canine unit to the scene without having any reason to suspect the vehicle contained a controlled substance, he changed the nature of the traffic stop into a drug investigation. *Cox*, 202 Ill. 2d at 469, 782 N.E.2d at 280. However, the court's final decision in *Cox* rested on its determination that the police had impermissibly prolonged the stop. *Cox*, 202 Ill. 2d at 471, 782 N.E.2d at 281. In *Caballes*, the court clarified that under the *Terry* analysis, a canine sniff impermissibly broadens the scope of a traffic stop in the absence of specific and articulable facts to support it, regardless of the timeliness of the stop. *Caballes*, 207 Ill. 2d at 509, 802 N.E.2d at 204.

It is possible that Gallagher impermissibly prolonged the investigative stop by running warrant checks on the passengers in the car. See *People v. Harris*, 207 Ill. 2d 515, 528, 802 N.E.2d 214, 228 (2003) (improper warrant check of passenger "could well have lengthened the duration of the detention if the officer had to wait for the results of the warrant check"). In any case, because there was no reasonable suspicion supporting the canine sniff, it impermissibly broadened the scope of the traffic stop into a drug investigation. Therefore, the trial court should have granted defendant's motion to suppress the evidence obtained as a result of the search following the police dog's alert. Because this ruling requires a new trial on the merits, we need not consider whether the trial court erred by not granting a new trial after denying the motion to suppress.

We reverse the trial court's judgment.

Reversed.

APPLETON, J., concurs.

JUSTICE STEIGMANN, dissenting:

Although this is a close case, I conclude that Gallagher acted reasonably and appropriately. Accordingly, I respectfully dissent.

The majority concludes (and I agree) that the initial traffic stop was justified. Further, under Illinois law, an appropriately conducted canine sniff can lead to probable cause to arrest a vehicle's occupants. See *People v. Staley*, 334 Ill. App. 3d 358, 368, 778 N.E.2d 362, 369-70 (2002). Thus, the focus of this court's inquiry should be on whether Gallagher properly called for the canine unit to conduct a sniff of defendant's car after it was pulled over for the traffic stop.

In *Caballes*, 207 Ill. 2d at 509, 802 N.E.2d at 204, the supreme court discussed its earlier canine sniff decision in *Cox*, 202 Ill. 2d 462, 782 N.E.2d 275, and wrote the following:

"In *Cox*, we concluded that evidence obtained by a canine sniff was properly suppressed because calling in a canine unit unjustifiably broadened the scope of an otherwise routine traffic stop into a drug investigation. [Citation.] We emphasized that the sniff was impermissible without ' "specific and articulable facts" ' to support the stopping officer's request for the canine unit. [Citation.]"

Accordingly, the question before us is whether the information Gallagher possessed constituted "specific and articulable facts" to support his request for the canine unit. I believe the answer is yes.

The United States Supreme Court has recently provided some guidance in this area. In *United States v. Arvizu*, 534 U.S. 266, 273-74, 151 L. Ed. 2d 740, 749-50, 122 S. Ct. 744, 750-51 (2002), the Court wrote the following:

"When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing. [Citation.] This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' [Citation.] See also *Ornelas v. United States*, 517 U.S. 690, 699[, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663] (1996) (reviewing court must give 'due weight' to factual inferences drawn by resident judges and local law enforcement officers). Although an of-

ficer's reliance on a mere ' "hunch" ' is insufficient to justify a stop [citation], the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."

In *Ornelas*, 517 U.S. at 695, 134 L. Ed. 2d at 918, 116 S. Ct. at 1661, the Supreme Court wrote the following:

"Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are commonsense, nontechnical conceptions that deal with ' "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." ' [Citations.]"

Here, the trial court found that Gallagher was a credible witness who was experienced and well-versed in drug-related behavior in the north part of Champaign, particularly the three- or four-block area that harbored crack-cocaine activity, from which this case arose. The record supports this finding. Given the circumstances before Gallagher and viewing them—as we must—with "the factual and practical considerations of everyday life in which reasonable and prudent men, not legal technicians, act" (*Ornelas*, 517 U.S. at 695, 134 L. Ed. 2d at 918, 116 S. Ct. at 1661), I conclude that Gallagher was possessed with sufficient "specific and articulable facts" to support his request for the canine unit. Once that unit arrived at the scene (only a few minutes later) and the positive canine sniff occurred, the police conduct that followed was entirely justified. Thus, the evidence they seized should not be suppressed.