THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. REGAN W. GRAF, Defendant-Appellant.

Second District    No. 2—93—0978

Opinion filed August 10, 1994.

Law Offices of Donahue, Sowa & Bugos, of Geneva, and John F. Donahue, of Donahue, Sowa & Bugos, of Lisle, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Lisa A. Hoffman, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

After a bench trial with stipulated evidence, defendant, Regan W. Graf, was convicted of the unlawful possession of more than 500 grams of cannabis with the intent to deliver (Ill. Rev. Stat. 1991, ch. 56$^1$/$_2$, par. 705(e) (now 720 ILCS 550/5(e) (West 1992))). The trial court sentenced defendant to 90 days' incarceration in the county jail and 30 months' probation and imposed a $1,000 mandatory statutory assessment. On appeal, defendant contends that, at the hearing on defendant's motion to suppress evidence, the trial court erred in granting the State's motion for a directed finding. The issue here is whether defendant failed to make a *prima facie* showing that he and his parents did not voluntarily consent to a search of their home.

Defendant's father, Ron Graf, testified that he lives with his wife and children in a home in Downers Grove. Defendant lives in the basement of the home. At about 9:30 p.m. on October 13, 1992, Ron was in bed. As he was about to fall asleep, he heard someone knocking loudly at the front door of the house and went downstairs. As he was walking towards the front door, he heard someone banging on one of the side doors and also the back door. Ron then went out onto the enclosed back porch and saw someone dressed in black racing across the deck in the backyard.

Ron opened the door leading from the back porch to the backyard, turned on the porch lights, and saw a uniformed police officer. The officer asked Ron if defendant was home, and Ron said that he would go get him. The officer then asked Ron where defendant was and

started walking into the porch area with Ron. Ron started to close the door and told the officer that he would be back as soon as he found defendant. The officer tried to walk into the porch area. Ron said "whoa," and tried to pull the door shut. The officer attempted to pull the door open, and Ron said, "Wait a minute. I'll go downstairs and see if he is down there."

The officer said that something "big" occurred that involved a lot of money. Ron indicated that he did not know what the officer was talking about. When the officer asked if defendant was home, Ron said, "I told you, I don't know."

Ron testified that a second officer appeared. They both pushed the screen door open and stood in the doorway. Ron said that he would go get defendant. The officers replied that they could not let Ron go downstairs and tried to enter the porch. Ron attempted to resist them by raising his hands. He said, "Whoa. There is the line, gentlemen. That threshold is my house. No one is allowed in there. Do you have a search warrant?"

When the officers replied that they did not have a warrant, Ron told them to go get one. The officers said they would if they had to, and Ron told them that they did have to get a warrant. Ron said that he did not know what the officers wanted and again offered to get defendant and bring him to the door.

The officers started to walk into the porch area. Ron tried to use his body to block the first officer. The second officer "scooted" by Ron and entered the porch. The first officer managed to force his way into the porch area. Ron instructed the officers to remain on the porch. The second officer ran through the kitchen and started to make his way upstairs. Ron yelled for the officer to come back to the kitchen and stated that his father-in-law was sick and easily upset.

The officer complied and returned to the kitchen. Ron's wife, Rosemary, emerged from the basement. Ron instructed her to get defendant. As she started to go down the stairs, the second officer followed her down the stairs. Ron said, "Dammit, I warned you guys. Get the hell out of here."

The second officer stood with Rosemary at the bottom of the stairs while she called to defendant. By the time they emerged from the basement with defendant, there were two other police officers in the house. Ron did not see these two officers enter. The officers confronted defendant, claiming that defendant participated in a controlled drug purchase and had the money from the transaction. At this point, Ron instructed defendant and the officers to get out of the house and discuss this matter outside. Defendant and the officers went out on the porch and conversed for about an hour. The officers came inside,

and they and Ron sat at the kitchen table and conversed further. At one point, Ron offered the officers coffee.

Ron testified that he signed a consent to search form that gave the officers permission to search the basement. The officers told him that, if he did not sign the document, he would be up all night until they got the search warrant. Ron testified that he signed the form to get the officers to leave his house. The officers searched defendant's room and found the incriminating evidence.

Rosemary Graf testified that, at about 10 p.m. on the evening in question, she was in the basement doing laundry. She heard a "ruckus" upstairs in the kitchen and went to see what was happening. When she came upstairs, a uniformed police officer was standing by the basement door and asked her if defendant was home. Rosemary's testimony essentially corroborated Ron's testimony about what happened after she emerged from the basement. She added that, while defendant and the officers were on the porch, she overheard the officers accuse defendant of having their money. They asked defendant to let them go into the basement and retrieve it. Defendant replied, "No, because you guys are going to burn me."

According to Rosemary, only three officers were present. One of the officers sat her and Ron down in the kitchen and said, "Hey, you are going to have to talk to your son. We've got to get what is owed us. We want our money. Otherwise, we are going to get a search warrant. Please talk to your son and let's get this over with." All of the officers were very polite and never became abusive or confrontational.

Rosemary also signed the consent to search form. She testified that the officers told her that, if she did not sign it, they all would be up all night waiting for a judge to sign the search warrant. The officers claimed that they had all of the time in the world. They also said that they would search only defendant's room. Rosemary testified that the reason that she signed the consent form was because she did not want to be up all night.

Defendant testified that, on the evening in question, he was watching television in his room when his mother came downstairs and told him that the police wanted to see him. He went out to the porch with two of the officers. One of them informed defendant that a confidential informant claimed that he had just purchased marijuana from defendant. Defendant told the officers that they did not have a search warrant and asked them to leave the house. The officers said, "Sit down or we are going to arrest you."

Defendant continued to tell the officers to either get a search warrant, arrest him, or leave. Defendant testified that the officers did

arrest him. They asked defendant to sign a consent to search form, and defendant refused. Defendant asked if he and his family would have to wait all night for a search warrant, and the officers replied that they would get one right away. Defendant replied, "No, you can't. You have to wait until morning."

After defendant and the officers argued a little while longer, defendant signed the form. Defendant testified that about 1 to $1^1/_2$ hours passed between the time he first emerged from the basement and the time he signed the form. The officers did not threaten defendant.

The State moved for a directed finding, claiming that defendant failed to demonstrate that the consent he and his family gave to search the basement was anything less than voluntary. The trial court granted the motion, concluding that there was a showing that the Grafs consented to the search. At the bench trial, the court found defendant guilty after hearing the stipulated evidence. The court denied defendant's post-trial motion, and this timely appeal followed.

●1 A search and seizure conducted pursuant to a defendant's valid consent does not violate the fourth amendment. (*People v. Koniecki* (1985), 135 Ill. App. 3d 394, 401.) At a hearing on a motion to suppress evidence, the defendant has the burden of showing that the search and seizure were unlawful. (*People v. Janis* (1990), 139 Ill. 2d 300, 308.) Once the defendant makes a *prima facie* showing that the search and seizure were unlawful, the burden shifts to the State to come forward with evidence justifying the intrusion. (*People v. Scott* (1993), 249 Ill. App. 3d 597, 600.) Here, defendant's evidence established that defendant and his parents consented to the search of defendant's room. However, that the defendant and his parents signed a written consent form is not dispositive if the circumstances show that the consent was obtained by some form of coercion. (*People v. Cardenas* (1992), 237 Ill. App. 3d 584, 588.) Defendant claims he presented evidence sufficient to demonstrate that the consents were not given voluntarily.

●2 A determination of the voluntariness of a consent to a police search must be made by examining the totality of the circumstances. (*People v. Casazza* (1991), 144 Ill. 2d 414, 417.) Consent is not voluntary where it is the result of official coercion, intimidation, or deception. (*Cardenas*, 237 Ill. App. 3d at 588; *People v. Guenther* (1992), 225 Ill. App. 3d 574, 578.) Defendant does not raise any issues regarding his parents' authority to consent to a search of his room.

Several cases have held that a police officer making a groundless threat and presenting the occupant with the choice of either consenting or suffering the consequences of the threatened course of

conduct can serve to vitiate that person's consent. In *Casazza*, the police had received information that, shortly before a drowning incident, the victim had consumed beer and drugs in a yacht with two older women. The police found the yacht which matched the description they had received. The yacht owner signed a consent to search form after the police officers told him that, if he did not consent to the search, they would obtain a warrant and require everyone aboard the yacht to leave it while the officers sought a warrant. The officers did, however, inform the owner of his right not to consent to the search. The court upheld the suppression of the evidence seized during that search, finding that the trial court correctly concluded that the police officers' illegal representation that they had the authority to seize the yacht vitiated the owner's consent. *Casazza*, 144 Ill. 2d at 424.

In *People v. Wahlen* (1982), 111 Ill. App. 3d 194, the court also upheld the trial court's suppression of evidence seized during a search executed after college students gave the officers consent to search their dormitory room. The court found that a significant factor demonstrating coercion was the officers' statement to the students that, if they failed to consent, they would be forced to leave their room until a search warrant could be obtained. (*Wahlen*, 111 Ill. App. 3d at 197.) In *People v. Griffin* (1987), 158 Ill. App. 3d 46, the court found that the police officers' statement that the defendants could not enter their home until the police took steps to obtain a warrant was one factor that supported the trial court's conclusion that the defendants did not voluntarily consent to a search of their home. *Griffin*, 158 Ill. App. 3d at 52; see also *Cardenas*, 237 Ill. App. 3d at 588 (officer's statement to defendant conveyed the false impression that officer would have the authority to search defendant's automobile even if defendant did not consent to a search).

●3 Here, Ron's testimony indicates that the police officers stormed the house and, without a warrant, essentially forced their way into the home. Ron made several unsuccessful attempts to prevent the officers from entering through the back door. Other officers entered the home without Ron noticing. Rosemary testified that she heard a "ruckus" in the kitchen. When she emerged from the basement, she saw police officers in her home. This warrantless entry into the Graf household served to create a coercive atmosphere from the start.

In addition, the police officers told defendant's parents that they would be up all night while the officers sought a search warrant. A reasonable interpretation of this statement is that the Grafs would not be able to enter the basement and would have to remain in the officers' presence while other officers sought a search warrant. The

officers were essentially implying that they had the authority to secure the basement until they could obtain a warrant. Ron and Rosemary testified that they felt that signing the consent form was the only way to get the officers to leave. Like the court in *Wahlen,* we know of no authority that grants the police the power to "seal" a room until a warrant may be obtained. (See *Wahlen,* 111 Ill. App. 3d at 197.) In *Casazza,* the court refused to interpret *Segura v. United States* (1984), 468 U.S. 796, 82 L. Ed. 2d 599, 104 S. Ct. 3380, as granting the police such authority and held that the groundless threat to seize the yacht vitiated the voluntariness of the owner's consent. (*Casazza,* 144 Ill. 2d at 419-24.) Here, the officers' representation that the Grafs would have to stay up all night until a warrant could be obtained may similarly have the effect of vitiating the Grafs' consent to search the basement.

The State claims that defendant's testimony casts doubt upon whether the officers actually made this representation. The officers told the defendant that they could obtain a warrant right away. Defendant said, "No, you can't. You have to wait until morning."

The significance of this statement is unclear. It is possible that defendant heard the officers tell his parents that everyone would be up all night waiting for the warrant. Defendant may have been concerned about having to wait all evening for a warrant and made this statement to challenge the officers' claim that they could obtain a warrant right away. This testimony does not necessarily negate the testimony of defendant's parents.

Also, we note that Ron and defendant initially refused to allow the officers to search the basement and told them to get a warrant. An initial refusal to allow the police to search the premises is a factor that could demonstrate a lack of voluntariness. (*Cardenas,* 237 Ill. App. 3d at 588.) Here the initial refusal on the part of defendant and his father could support a conclusion that they consented only because they were misled and coerced into consenting.

In summary, defendant presented evidence that the officers created a coercive environment by entering the Graf home without consent and that they made a groundless claim that, if nobody consented, they could keep defendant and his parents up all night while the officers obtained a search warrant. Defendant and his father consented after initially asserting their rights and refusing to allow the police to search the basement. This evidence was sufficient to establish defendant's *prima facie* case that the police obtained the evidence in violation of the fourth amendment. The record indicates that the trial court focused solely on the signing of the consent form and ignored these other factors indicating potential coercion. We

conclude that the trial court should not have granted the State's motion for a directed finding.

The appropriate disposition is to remand the cause so the State may present its evidence. (See *Janis*, 139 Ill. 2d at 319-20.) On remand, the State will have the burden of demonstrating by a preponderance of the evidence that the consents in this case were given voluntarily. *Casazza*, 144 Ill. 2d at 417.

For the foregoing reasons, we reverse the judgment of the circuit court of Du Page County and remand the cause for further proceedings consistent with the views expressed herein.

Reversed and remanded.

McLAREN and DOYLE, JJ., concur.