THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JOEL ORTIZ, Defendant-Appellee.

Fourth District    No. 4—00—0187

Opinion filed November 1, 2000.

COOK, P.J., specially concurring.

John P. Schmidt, State's Attorney, of Springfield (Norbert J. Goetten, Robert J. Biderman, and James C. Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

No brief filed for appellee.

JUSTICE GARMAN delivered the opinion of the court:

In November 1999, the State charged defendant, Joel Ortiz, with possession of more than 5,000 grams of a substance containing cannabis and with the knowing intent to deliver the same. 720 ILCS 550/4(g), 5(g) (West 1998). Defendant filed a motion to quash the arrest and suppress the cannabis that served as the basis for the charge. The trial court granted defendant's motion. The State filed this interlocutory appeal pursuant to Supreme Court Rule 604(a)(1) (145 Ill. 2d R. 604(a)(1)). On appeal, the State argues that the trial court's order granting defendant's motion to quash the arrest and suppress the evidence was manifestly erroneous. We affirm.

## I. BACKGROUND

At the hearing on defendant's motion to suppress, Officer Michael Jennings testified that he has been with the Illinois State Police for 10 years. He is a drug interdiction instructor and a member of the District 9 Drug Interdiction Team, a program sponsored by the Drug Enforcement Agency (DEA). The program, designated the Valkyrie program, has assigned four teams within the Department of State Police to four highways designated by authorities as the most commonly used drug thoroughfares. Jennings has learned through training and the program certain indicators of drug trafficking, including certain types of vehicles, hidden compartments, and body language, and the law pertaining to search and seizure.

On November 26, 1999, Jennings was patrolling Interstate 55 (I-55), a "major drug thoroughfare," and had two members of an international drug interaction unit from Oman and Costa Rica with him.

As Jennings was traveling northbound in the right lane, he noticed a Chevy pickup pass on the left. Jennings testified that he routinely sets his cruise control at 54 miles per hour and had done so that day. When the truck passed him, he noticed that the truck slowed down a little, the driver looked at him, there were mattresses on top of a tarp in the bed of the pickup, and it had a "D" license plate. Jennings stated that it was "odd" to him that the license had a "D" since most

trucks are registered as "B" plates; however, the "D" plate was not illegal. Jennings further testified that he had made seizures in the past where furniture and mattresses were used to secure contraband, but there was nothing illegal or unusual about carrying mattresses in and of itself.

Jennings then called in the license plate and learned that the vehicle was registered to an Aldofo Ferrer of Aurora, Illinois. Jennings testified he found that "interesting" because most "D" plates are registered to a commercial business rather than an individual. The "D" plate, the mattresses, and the Aurora registration "tweaked" his interest. He testified that "it was a vehicle that would be interesting to stop and see if [he] could find out more information on it." After pacing the vehicle for 1½ miles, Jennings decided to stop the truck for speeding.

The officer exited his squad car and approached the passenger side of the truck. Jennings informed defendant, the driver, that he had been stopped for speeding. Defendant replied that he was only going 70 miles per hour and had been moving with the flow of traffic. Jennings informed him that he "wasn't going to write him a ticket but he needed to slow down." He then asked defendant for his driver's license and insurance information, which defendant provided. The officer then asked defendant where he was headed, to which defendant replied he was coming from St. Louis, was having troubles with his girlfriend, had gone to pick up furniture, and was moving back to Aurora. Jennings also asked if he owned the vehicle. Defendant replied the truck belonged to a friend. When asked the name of the friend, defendant reached for a document and read the owner's name from it. According to Jennings, the above facts were significant to him because in the past 18 months to 2 years, there have been many major drug seizures where the point of destination was reported as Aurora and 95% of interdictions are made on third-party vehicles where the owner is not present.

During the conversation, the officer observed another person lying in the rear of the cab with a coat over his head and shoulders. The person (later identified as Davis), eventually sat up. The officer assumed the person had been sleeping and asked him for his driver's license. Jennings then went back to the squad car. The initial approach to defendant's vehicle took about 2½ to 3 minutes.

Jennings ran a criminal history check on defendant and Davis. The inquiries lasted three to five minutes. Jennings learned that defendant had a valid driver's license and no outstanding warrants. Davis had a criminal history consisting of arrests for forgery and possession of controlled substances. Upon learning Davis' criminal history,

Jennings decided to obtain a canine unit. He learned that a canine was within three miles and requested its assistance. The canine arrived within 10 minutes of the call—after Jennings completed the written warning, but before he finished explaining the procedures and requirements for a canine "walk around" to the dignitaries riding with him. Jennings testified that he had not received criminal history information on defendant, nor completed his paperwork, when the canine officer arrived. Furthermore, Jennings testified that the traffic stop was not "elongated" or "stalled out" because of his request for the canine.

The officer then walked to the back of the truck and motioned for defendant to exit his vehicle. Jennings did this because he was "a little uncomfortable" about the other person in the truck, and he wanted to speak with the two parties separately.

Jennings issued defendant a warning and returned his license. The officer testified that, at this time, the traffic stop was complete. However, Jennings asked defendant if he would answer some questions before he left. Defendant responded, "Sure." Jennings testified that there was no hesitancy in defendant's voice; defendant was cooperative. Then, Jennings explained to defendant that he was involved in a drug interdiction unit that is working on a major drug thoroughfare. Jennings further explained that because defendant was traveling to Aurora, a "hotbed" for drugs, and the owner of the truck was not present, both common indicators of drug trafficking, he wanted defendant's consent to search the truck. Defendant responded by stating, "It is not my truck." Jennings replied that defendant had authority to give consent because he was in actual physical control of the vehicle. Defendant then asked, "Do I have to? Can I refuse?" Jennings told defendant he had a right to refuse. Defendant then refused.

Jennings turned to the canine officer and told him defendant was refusing consent. He then told defendant the canine officer would walk the police dog around the truck. Jennings testified that, although he had not told defendant he was free to leave, he would have let defendant leave. At the preliminary hearing, the officer acknowledged that he had testified as follows:

"Q. And then you asked him whether you could search the vehicle?

A. Yes.

Q. Did you ask him any other questions besides that?

A. Not that I can remember.

Q. And he refused?

A. Yes.

Q. At which point you indicated that you needed him to wait for a canine?

A. No, there was no waiting. While the canine was present, I told him that I was going to have a canine walk around his vehicle.

Q. But he was detained at that point?

A. Yes, you could call it that."

Jennings asked Davis to exit the vehicle and told him, "We are conducting a walk around search of the vehicle." Jennings proceeded to pat Davis down for weapons and asked him where he was coming from and where he was going. Less than a minute later the canine alerted. The officer obtained the keys for the bed of the truck and discovered 740 pounds of cannabis. Jennings testified that less than a minute elapsed between defendant's refusal to consent and the beginning of the walk around. The walk around itself took less than two minutes.

Joel Ortiz testified that he was stopped for speeding at approximately 10:45 a.m. There was a male passenger sleeping in the backseat of his truck. The officer approached the vehicle and asked him if he had been speeding. Defendant replied that he was going about 70 miles per hour, whereupon Jennings stated that defendant was going 74. The officer then asked defendant for his driver's license and insurance; defendant provided both. Jennings inquired as to whose vehicle it was. Defendant replied that it was his cousin's vehicle, Adolfo Ferrer. His cousin's name was on the insurance papers.

Defendant testified that the officer returned to his squad car and remained there for at least five minutes. Jennings then approached the back of the truck and told defendant to step out. The officer informed defendant that he was going to issue him a warning ticket and he could leave after that, but then stated, "Can I ask you for [sic] a couple of questions?" Defendant answered "Sure." Jennings then asked if he could search the truck. Defendant told the officer no because defendant did not own the vehicle. He asked Jennings if he had a right to refuse the search and the officer told him he did. However, Jennings said that, if defendant refused, the officer could bring the canine to walk around the car. Defendant testified that he did not feel free to leave the scene. After the refusal, Jennings told defendant to sit in the back of the patrol car. Jennings then asked Davis to step out of the truck. Subsequently, the canine officer proceeded to walk the dog around the truck.

On cross-examination, defendant testified that Jennings did not tell him he was free to leave but wanted to ask him a few questions. Defendant testified in relevant part as follows:

"Q. All right, and at that period, did you—you agreed to stay and talk with him, right?

A. I felt like I was being, you know—I felt like I couldn't leave, you know. I was answering questions.

Q. But your initial response was, 'Sure'?

A. I said, 'Sure, you can ask me some questions.'

Q. And you didn't protest or in any other way tell him that you didn't want to stay, is that right?

A. Correct."

On redirect examination, defendant testified in relevant part as follows:

"Q. [DEFENSE COUNSEL]: Just so we are clear, did—when I questioned you first, you may have said the trooper told you that you were free to leave. Did the trooper ever tell you that you were free to leave?

A. He told me, 'You can go as soon as I am done asking you questions.'

Q. Okay, and did you feel like you were free to leave?

A. No."

Illinois State Police Sergeant Donald Biswell testified that he works with the District 9 drug interdiction unit. He is a canine handler and had worked with "Ben," a certified and trained narcotics dog, for 2½ years. He received a call to go to Officer Jennings' location at approximately 10:45 to 11 a.m. It took him between three and five minutes to arrive. When he arrived, Jennings was in his squad car, completing paperwork for a traffic stop. Biswell testified that Jennings continued with his paperwork for three to five minutes. When Jennings finished he approached the truck, asked defendant to step out, and explained the warning to him. Jennings asked defendant to consent to a search of the truck and defendant refused. Jennings then asked Biswell if he would conduct a walk around of the truck. The walk around began immediately. Altogether, from the time Jennings asked Biswell to do the walk around to its completion less than 15 seconds elapsed.

Upon conclusion of arguments of counsel, the trial court granted the motion to quash the arrest and suppress evidence, reasoning as follows:

"As in [*People v. Koutsakis*, 272 Ill. App. 3d 159, 649 N.E.2d 605 (1995),] cited in [d]efendant's memo, Trooper Jennings could legitimately check Ortiz's driver's license, run a warrant check, and issue a warning ticket. After this was accomplished, and no further reasonable suspicion was aroused, Ortiz could no longer be detained. There was no testimony in this [c]ourt's opinion that the legitimate inquiries provided a valid basis for searching Ortiz's vehicle. No valid basis for searching the vehicle existed until the police dog alerted. The detention of Ortiz and his passenger for 15 minutes was longer than the time reasonably necessary for Trooper Jennings to conduct the legitimate police activities normally associ-

ated with a routine traffic stop. In this [c]ourt's opinion, Trooper Jennings was stalling for additional time so that the canine unit could arrive. The actions of Trooper Jennings and Sergeant Biswell after the initial lawful purpose for the traffic stop was concluded amounted to a seizure and illegal detention in violation of the [f]ourth [a]mendment. This [c]ourt further finds that a reasonable person under the circumstances in this case would likely conclude that if he or she drove away, the officers would pursue. The subsequent search of the Ortiz vehicle was invalidated by the illegal detention and the search and seizure are also determined to be illegal."

This interlocutory appeal followed.

## II. ANALYSIS

### A. Detention of Defendant

The State first argues that the trial court's ruling was manifestly erroneous because defendant failed to meet his burden of showing that he was seized within the meaning of the fourth amendment to the United States Constitution (U.S. Const., amend. IV) and unlawfully detained.

■ Defendant, as appellee, filed no brief on appeal. A court of review is not compelled to serve as an advocate for the appellee and is not required to search the record for the purpose of sustaining the judgment of the trial court. *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495 (1976). However, if the record is simple and the claimed errors are such that the court can easily decide the case without the aid of the appellee's brief, the court should decide the merits of the appeal. On the other hand, if the appellant's brief demonstrates *prima facie* reversible error and its contentions find support in the record, the judgment of the trial court may be reversed. *Talandis*, 63 Ill. 2d at 133, 345 N.E.2d at 495. We conclude that we may decide the issues raised by the State here.

■ A trial court's ruling on a motion to suppress is given great deference since the trial judge is in the best position to determine the credibility of witnesses and to resolve any conflict in their testimony. *People v. Melock*, 149 Ill. 2d 423, 432, 599 N.E.2d 941, 944 (1992). Accordingly, this court will not disturb a trial court's ruling on a motion to suppress unless it is manifestly erroneous. *People v. Thompson*, 215 Ill. App. 3d 514, 519, 575 N.E.2d 256, 259 (1991).

■ On a motion to suppress evidence, the defendant has the burden of showing that the search and seizure were unlawful. 725 ILCS 5/114—12(b) (West 1998); *People v. Janis*, 139 Ill. 2d 300, 308, 565

N.E.2d 633, 637 (1990). However, once the defendant makes a *prima facie* showing of an illegal search and seizure, the burden shifts to the State to produce evidence justifying the intrusion. *People v. Graf*, 265 Ill. App. 3d 746, 750, 638 N.E.2d 1181, 1184 (1994).

A seizure occurs only " 'when, by means of physical force or a show of authority,' that person's 'freedom of movement is restrained.' " *People v. Brownlee*, 186 Ill. 2d 501, 517, 713 N.E.2d 556, 564 (1999), quoting *United States v. Mendenhall*, 446 U.S. 544, 553, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980). The court will look at the totality of the circumstances surrounding the incident to determine if "a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877. The standard to determine whether a seizure occurred, therefore, is an objective one. *Florida v. Royer*, 460 U.S. 491, 501-02, 75 L. Ed. 2d 229, 239, 103 S. Ct. 1319, 1326 (1983); see also *People v. Besser*, 273 Ill. App. 3d 164, 167, 652 N.E.2d 454, 457 (1995).

In this case, the parties do not dispute that the initial stop of defendant's vehicle was valid. Shortly after approaching the vehicle, Jennings told defendant that he was not going to issue a traffic ticket. The officer went back to his squad car, began writing a warning, and ran a criminal history check on defendant and Davis. When a police officer is engaged in a minor traffic stop, he may briefly detain the driver to request a valid driver's license. In addition, under certain circumstances, he may conduct a speedy warrant check. However, once those tasks are completed, if no further suspicion is aroused, the traffic stop must cease and the individual should no longer be detained. *People v. Koutsakis*, 272 Ill. App. 3d 159, 163, 649 N.E.2d 605, 608 (1995).

According to the testimony, Jennings called for the canine after the warrant check revealed Davis' criminal history. The warrant check lasted anywhere from three to five minutes. Jennings also testified that the canine arrived within 10 minutes after his request. Biswell testified that he responded to the scene within three to five minutes. Biswell further testified that Jennings continued with his paperwork for three to five minutes after Biswell arrived. All of this is in addition to the initial approach of the vehicle by Jennings, which lasted between 2 1/2 to 3 minutes. The trial court concluded "that the detention of Ortiz and his passenger for 15 minutes was longer than the time reasonably necessary for Trooper Jennings to conduct the legitimate police activities normally associated with a routine traffic stop." According to the testimony, the least possible amount of time it took Jennings to run a criminal history check and write a one-page warning ticket was 11 1/2 minutes. On the other hand, it could have lasted for

23 minutes. Regardless of the length of the traffic stop, we conclude that the detention of defendant after the completion of the traffic stop is dispositive.

Jennings testified that the stop was complete after he handed defendant the warning and returned his license. Contemporaneous with the completion of the stop Jennings asked defendant if he would answer some questions before he left and defendant consented; however, when Jennings asked defendant if he would consent to a search of the vehicle, defendant refused. At this point, Jennings turned to Biswell, informed him that defendant was refusing to consent, and then told defendant that "they [Biswell and the canine] were going to conduct a walk around of his vehicle." Defendant testified that Jennings told him that if he refused, he could bring the canine to walk around the car. After defendant refused, Jennings told defendant to take a seat in the back of the patrol car.

In *People v. Anaya*, 279 Ill. App. 3d 940, 665 N.E.2d 525 (1996), cited by the State, the defendant was stopped by two police officers after she disembarked from a train. The officers approached defendant and asked her if she had come in on the Texas Eagle. Defendant replied that she had. The officers then asked her for identification. Defendant asked why. Officer Krok explained that he was conducting a routine narcotics investigation, but that she was not under arrest and was free to leave. Defendant provided identification. Krok then asked defendant for permission to search her luggage, but she refused. Krok then told her the luggage would be temporarily detained so the bags could be searched by a trained narcotics dog. The bags were detained and sniffed; the canine alerted and cannabis was found. *Anaya*, 279 Ill. App. 3d at 943-44, 665 N.E.2d at 527-28.

In its analysis, the court held that the initial exchange between defendant and police was consensual. Although Krok immediately asked if defendant came from the Texas Eagle and asked for identification, shortly thereafter he made it clear that defendant was not under arrest and promptly returned her driver's license. *Anaya*, 279 Ill. App. 3d at 945, 665 N.E.2d at 528. However, the court further stated:

> "The State concedes *** that the consensual nature of the officers' encounter with the defendant ended when the defendant denied Officer Krok permission to search her luggage. Therefore, in order for the detention of the defendant's luggage to pass constitutional muster, the officers must have had a reasonable and articulable suspicion that she committed or was about to commit a crime." *Anaya*, 279 Ill. App. 3d at 945, 665 N.E.2d at 529, citing *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

This case is quite similar to *Anaya*. Here, defendant consented to

answer questions. However, he refused to allow a search of his vehicle. Subsequently, Officer Jennings informed defendant that a canine would walk around the car. Defendant was told to take a seat in the back of the squad car. The trial court found that, after the initial lawful purpose of the traffic stop concluded, the actions of the officers constituted a seizure and illegal detention of defendant in violation of the fourth amendment. The trial court held that a reasonable person under similar circumstances would not have felt free to leave. After defendant's refusal and Jennings' order to sit in the squad car, the voluntary question-and-answer session ceased and the traffic stop turned into a detention. A reasonable person would not have felt free to leave the scene. We conclude that defendant met his burden and the trial court's finding of a seizure was not manifestly erroneous.

## B. Search Subsequent to the Detention

The State further argues that, if we find defendant was seized, any detention was justified by reasonable suspicion of criminal activity. Once the defendant makes a *prima facie* showing of an illegal search and seizure, the burden shifts to the State to produce evidence justifying the intrusion. *Graf*, 265 Ill. App. 3d at 750, 638 N.E.2d at 1184.

■ Courts have determined that there are three tiers of police-citizen encounters. *People v. Murray*, 137 Ill. 2d 382, 387, 560 N.E.2d 309, 311 (1990). The first tier involves an arrest of a citizen, which must be supported by probable cause. The next tier involves a brief seizure, also known as a *"Terry"* stop. This brief seizure must be supported by a reasonable suspicion of criminal activity. *Murray*, 137 Ill. 2d at 387, 560 N.E.2d at 311, citing *Terry*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. The final tier, known as the community caretaking or public-safety function, does not involve a seizure at all and so does not implicate the fourth amendment. *Murray*, 137 Ill. 2d at 387, 560 N.E.2d at 311-12.

■ The United States Supreme Court extended the *Terry*-type stop to canine searches of an individual's luggage. Officers need to have reasonable suspicion that contraband is present in the luggage prior to its detention for a search of that type. *United States v. Place*, 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983). The Court concluded:

> "[W]hen an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope." *Place*, 462 U.S. at 706, 77 L. Ed. 2d at 120, 103 S. Ct. at 2644.

As a result, a canine sniff is not a search for purposes of the fourth amendment. *Place*, 462 U.S. at 707, 77 L. Ed. 2d at 121, 103 S. Ct. 2644.

In reaching this conclusion, the United States Supreme Court balanced the nature and quality of the intrusion on the individual's fourth amendment rights against the importance of the governmental interests alleged to justify the intrusion. When intrusion is minimal, the opposing interests of law enforcement may justify a seizure based on less than probable cause. *Place*, 462 U.S. at 703, 77 L. Ed. 2d at 118, 103 S. Ct. at 2642. The Court held that a canine sniff is limited in the manner in which information is obtained from the search. Luggage does not need to be opened and other, noncontraband, items in the luggage are not exposed to the public. In addition, the content of the information obtained is limited because the sniff only divulges the presence or absence of contraband. Because of these aspects, a canine sniff is *sui generis*. *Place*, 462 U.S. at 707, 77 L. Ed. 2d at 121, 103 S. Ct. 2644.

Following the decision in *Place*, Illinois courts have also required an officer to have reasonable suspicion prior to detaining luggage for a canine sniff. See *People v. Steels*, 277 Ill. App. 3d 123, 129, 660 N.E.2d 24, 28 (1995); *People v. Lynch*, 241 Ill. App. 3d 986, 990, 609 N.E.2d 889, 892 (1993); *People v. Price*, 195 Ill. App. 3d 701, 708-09, 552 N.E.2d 1200, 1204-05 (1990). However, this court has not yet addressed the issue of whether the reasonable suspicion standard should be utilized before detaining an *automobile* to conduct a search for contraband. The Third District, however, has employed the standard in two such cases holding the officers needed reasonable suspicion prior to the detention. See *People v. Perez*, 288 Ill. App. 3d 1037, 1045, 681 N.E.2d 173, 178 (1997); *People v. Easley*, 288 Ill. App. 3d 487, 491, 680 N.E.2d 776, 780 (1997). We agree with the United States Supreme Court that a canine sniff search is unique and *"sui generis."* Since we have held that this type of search is minimally intrusive to an airport traveler, we see no reason to hold differently in an automobile case. Consequently, we find that a police officer must have the reasonable suspicion that contraband is present in an automobile prior to its detention for purposes of a canine sniff search.

■ In considering whether reasonable suspicion existed in this case, we look at the "totality of the circumstances." *Anaya*, 279 Ill. App. 3d at 945-46, 665 N.E.2d at 529, citing *United States v. Sokolow*, 490 U.S. 1, 8, 104 L. Ed. 2d 1, 10, 109 S. Ct. 1581, 1585 (1989). Even where there may be an innocent explanation for each individual factor considered separately, the factors viewed in combination may constitute enough reasonable suspicion to warrant further detention.

*Easley*, 288 Ill. App. 3d at 491-92, 600 N.E.2d at 780, citing *United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir. 1996).

Here, the State argues that the following factors gave rise to reasonable suspicion that defendant was transporting contraband: (1) defendant was driving a third-party vehicle; (2) he could not name the "friend" that owned the vehicle; (3) he was driving on I-55, a "major drug thoroughfare"; (4) he was traveling to Aurora, a major drug-trafficking destination; (5) he was carrying a mattress and a tarp in a manner consistent with the concealment of illicit drugs; (6) he demonstrated an "irregular demeanor"; and (7) he was traveling with a passenger who had an arrest record for illegal drugs.

The State has relied on the Third District cases that found that the officers had reasonable suspicion to detain the individuals and their vehicles. *Perez*, 288 Ill. App. 3d at 1045, 681 N.E.2d at 178; *Easley*, 288 Ill. App. 3d at 491, 680 N.E.2d at 780. We find that the facts in *Easley* are significantly dissimilar to the facts of this case. The facts in *Perez* are more closely related to this situation; however, they are also distinguishable. In *Perez*, the court affirmed the denial of a motion to suppress evidence, finding that the officer had sufficient reasonable suspicion to detain defendants for a few additional minutes to allow a canine to arrive. The court noted that the officer relied on the following factors to detain the vehicle: (1) based on the officer's extensive knowledge of and experience with trucks, he believed there might be a compartment under the truck beneath the spare tire; (2) the truck had a temporary registration sticker as well as license plates; (3) defendant gave a "patently implausible" explanation for his trip to California; and (4) the passenger had a prior drug conviction. *Perez*, 288 Ill. App. 3d at 1045, 681 N.E.2d at 178-79.

*Perez* is distinguishable for two reasons. First, the officer noticed that the spare tire underneath the truck was much lower than usual, indicating a hidden compartment and believed the rear portion of the truck had been modified in some way. *Perez*, 288 Ill. App. 3d at 1040, 681 N.E.2d at 175. This fact is more suspicious than an individual carrying mattresses on top of a tarp in the back of a pickup truck. It is not unusual to transport furniture in this manner and would not, in and of itself, arouse the suspicions of a reasonable person. In addition, Officer Jennings testified that carrying mattresses was not unusual. Second, in *Perez*, defendant gave a "patently implausible" explanation for his trip to California, suggesting that defendant was lying or misrepresenting facts. In contrast, nothing in the record here indicates that defendant gave false information to Jennings or misrepresented the place of his destination. Defendant told Jennings that he was going to Aurora and the officer confirmed that the vehicle was registered

to an Aldofo Ferrer of Aurora, Illinois. Jennings testified that defendant told him the truck belonged to a "friend" and defendant had to read the owner's name off a piece of paper. However, defendant testified that he promptly told the officer that the truck belonged to his cousin. The trial court is in the better position to analyze this testimony.

Finally, the fact that defendant was driving a truck that belonged to another, was heading to Aurora on I-55, was carrying mattresses and traveling with a passenger who had a criminal history record, does not support a finding of reasonable suspicion. The facts used to support an investigatory detention are insufficient when they "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures." *Reid v. Georgia*, 448 U.S. 438, 441, 65 L. Ed. 2d 890, 894, 100 S. Ct. 2752, 2754 (1980).

Accordingly, we conclude that the trial court's finding that the prosecution did not meet its burden of proving the detention was justified and therefore granting defendant's motion to quash arrest and suppress evidence was not manifestly erroneous.

## III. CONCLUSION

For the foregoing reasons, we affirm the trial court's ruling.

Affirmed.

KNECHT, J., concurs.

PRESIDING JUSTICE COOK, specially concurring:

I fully agree with the majority opinion. Specifically, I agree that nothing which occurred after the stop gave the police that reasonable suspicion of the presence of contraband which is necessary to detain a car in order to conduct a canine sniff. I also agree that the detention of defendant after the traffic stop had been completed was improper. Is there a lesson here? In the future, should the police carry dogs with them and make sure that the canine sniff is conducted before the traffic stop is completed?

One argument might be that, so long as the rules regarding traffic stops are complied with, a defendant has no right to complain when a canine sniff is conducted simultaneously with the traffic stop, just as a defendant would have no right to complain about a canine sniff of his vehicle which he had parked on a public street.

A contrary argument might be that the law which has developed regarding traffic stops represents the striking of a balance. On the one hand, the courts will not inquire into the actual motivation of the of-

ficer in making a traffic stop. The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the police officers involved. *Whren v. United States*, 517 U.S. 806, 813, 135 L. Ed. 2d 89, 98, 116 S. Ct. 1769, 1774 (1996). The pretextual nature of a stop does not invalidate it. *People v. Orsby*, 286 Ill. App. 3d 142, 146, 675 N.E.2d 237, 240 (1996). On the other hand, a traffic stop does not justify a general search of a vehicle. Where there is no reason to believe that the officer is in danger so as to justify a frisk, the officer may seize contraband in plain view or search by consent but no more. *People v. Smith*, 315 Ill. App. 3d 772, 776, 734 N.E.2d 1039, 1042 (2000).

If something new is added to traffic stops, the balance might change. That something new might be the routine presence of a canine unit at traffic stops, or the use of new equipment, *e.g.*, a flashlight that also analyzes the driver's breath for alcohol content. If an officer is allowed to conduct a thorough drug search of a vehicle at a traffic stop, by use of a canine unit or by other means, we can expect that many more vehicles will be stopped than in the past.

Should the police be allowed to stop any vehicle and check it for the presence of drugs? The Seventh Circuit recently held that could not be done, recognizing however that roadblocks at which drivers are checked for being under the influence of alcohol or other mind-altering drugs have been upheld. *Edmond v. Goldsmith*, 183 F.3d 659, 663, 665 (7th Cir. 1999), *cert. granted*, ___ U.S. ___, 145 L. Ed. 2d 1068, 120 S. Ct. 1156 (2000) ("[l]eading a drug-sniffing dog around a car cannot be justified by reference to a desire to detect traffic violations, *** the purpose of the roadblocks [here] is to catch drug offenders"). The dissent recognized there is a risk in "allowing stops of vehicles without person-specific cause" (or pretextual stops) because some officers will abuse the discretion thus conveyed. *Edmond*, 183 F.3d at 670 (Easterbrook, J., dissenting). "Some officers will stop people for the 'offense' of DWB ('driving while black')." *Edmond*, 183 F.3d at 670 (Easterbrook, J., dissenting). Nevertheless, the dissent would have upheld these roadblocks because of the rigorous protocol that had been established for them.

The present decision does not resolve these questions. Any answers must await future cases.