2022 IL App (2d) 210417-U
No. 2-21-0417
Order filed May 31, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE CITY OF HIGHLAND PARK, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 19-DT-2064 |
| | ) | |
| REGINOLD S. MORRIS, | ) | Honorable |
| | ) | Marnie M. Slavin, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court erred in granting defendant's motion to quash his arrest and suppress evidence obtained during a traffic stop. The stop was justified, as the officer's testimony and the squad-car video established that defendant weaved within his lane, crossed over line dividers, varied his speed for no reason, applied his brakes erratically, and exceeded the speed limit.

¶ 2   In December 2019, defendant, Reginold S. Morris, was stopped by City of Highland Park (City) police officer Daniel Norton after he observed, among other things, defendant cross the dashed lines dividing the lanes of traffic (625 ILCS 5/11-709 (West 2018)). After the stop, defendant was arrested and charged with driving while under the influence of drugs (*id.* § 11-

501(a)(4)).[1] Defendant moved to quash his arrest and suppress evidence of his drug use, arguing that Officer Norton lacked a reasonable and articulable suspicion for the stop. Following a hearing, the trial court granted defendant's motion. The City moved to reconsider. The court denied that motion, and the City filed a certificate of impairment and timely appealed. At issue is whether Norton had a constitutionally reasonable basis to stop defendant. We determine that he did. Thus, we reverse the order granting defendant's motion to quash and suppress and remand this cause for further proceedings.

¶ 3                                I. BACKGROUND

¶ 4      The only evidence presented at the hearing on defendant's motion to quash and suppress was Norton's testimony and the video from his squad car's dashboard camera showing the events leading to the traffic stop.

¶ 5      Norton testified that at around 1:43 a.m. on December 16, 2019, he was sitting in his marked squad car on the Lake Cook Road overpass approximately 100 feet from the entrance ramp to Route 41. Norton's squad car was facing east, and he was facing south watching northbound traffic on Route 41 approach the overpass. He was positioned there "[t]o observe vehicles travelling northbound to see *** if they were weaving within their lane prior to passing Lake Cook Road." He testified that snow was falling and "[l]ightly" accumulating on Route 41. While observing traffic, Norton saw a white sedan driven by defendant traveling north on Route 41. Norton observed the car "weaving within its lane" and decided to follow it. At that point, he had

---

[1] The Lake County State's Attorney's office gave the City the authority under section 16-102 of the Illinois Vehicle Code (Code) (*id.* § 16-102(c)) to prosecute certain traffic offenses.

not observed defendant commit any traffic violation. As he drove toward the entrance ramp to Route 41 northbound, Norton activated his squad car's dashboard camera.

¶ 6    When Norton entered Route 41 northbound, he was "[a]pproximately" a quarter mile behind defendant's car. As Norton was catching up, defendant approached the Clavey Road overpass, where the northbound lanes of Route 41 reduce from three to two. As defendant drove under the overpass, his car straddled the dashed line dividing the two northbound lanes. Once he caught up to defendant's car, Norton employed the pace method to track defendant's speed, maintaining a consistent distance between his squad car and defendant's car. While following defendant, Norton observed his car weaving within its lane and unnecessarily braking. Norton explained that defendant was tapping his brakes though it did not appear as if anything was in front of him. Norton, who was driving in the same lane as defendant, noted that he did not see any obstructions, defects, or other conditions on Route 41 that would have caused defendant to brake. Norton did not himself have to brake for any reason as he followed defendant. Norton never saw defendant lose control of his car or the car slip on ice or snow. Norton noted that his squad car did not slip on ice or snow as he drove behind defendant. He also noted that "there was really no accumulation on [Route 41]." Norton testified that the speed limit on Route 41 was 55 miles per hour from Lake Cook Road to just south of Park Avenue, where it reduced to 40 miles per hour. Defendant's speed changed intermittently, varying from 45 to 60 miles per hour, but he mostly drove 55 miles per hour.

¶ 7    Norton stopped defendant just north of Park Avenue and issued him a ticket for improper lane usage. Norton explained that the improper lane usage occurred when defendant's car straddled the lane divider under the Clavey Road overpass. Norton did not issue defendant any other tickets. However, he testified that, in reviewing the squad-car video, he observed an

additional traffic violation for the first time (he had not noted it in his police report). Specifically, just south of Park Avenue, defendant straddled the dashed line between the middle and right lanes where northbound Route 41 had widened again to three lanes. After the traffic stop, Norton arrested defendant.

¶ 8       Norton did not initially activate the audio recording on the dashboard camera. The squad-car video runs for 3 minutes and 40 seconds before defendant is stopped. The video begins with Norton approaching the entrance ramp to Route 41, shows him catching up to and following a white sedan as it travels north on Route 41, and ends as Norton is pulling over the sedan. The video shows light snowfall, some of which has accumulated on the entrance ramp. Route 41 itself is wet, with no accumulation on the roadway where defendant and Norton are driving. Norton never activates his windshield wipers before the stop. The white sedan is the only vehicle visible on northbound Route 41. The road curves gradually at points but is generally straight.

¶ 9       The sedan is first seen traveling in the middle lane of traffic. Right before the Clavey Road overpass, the three lanes of traffic merge into two lanes. After the merger into two lanes, the sedan straddles the dashed line dividing the lanes. Norton then activates the audio for the recording system and narrates what he observes as defendant continues to drive.

¶ 10      The squad-car video shows defendant weaving within his lane approximately five times and braking four or five times. Also, Norton mentions in his narration that defendant is driving 55 to 56 miles per hour as he approaches a 40-mile-per-hour zone. The video also shows that, after northbound Route 41 widens to three lanes just before Park Avenue, defendant, who is driving in the middle lane, straddles the dashed line between the middle and right lanes.

¶ 11      After Norton's testimony, the City moved for a directed finding, arguing that all the observations Norton made of defendant's driving—crossing the lane dividers, weaving within his

lane, speeding, varying his speed, and unnecessarily braking—provided a reasonable basis to stop defendant. The trial court denied the motion for a directed finding. The City recalled Norton, asking him to review the squad-car video and identify where he observed the various indicia of suspicious driving. The City then rested. During closing argument, the City reiterated that the traffic stop was constitutionally reasonable under the totality of the circumstances.

¶ 12    The trial court granted defendant's motion to quash and suppress. In doing so, the court—which indicated its familiarity with the area of the stop—found that, when Norton decided to follow defendant, he was doing so based on a "hunch that [defendant] was weaving." Because Norton testified that he had not observed defendant commit any traffic violations before deciding to follow him, "this appear[ed] to have been a fishing expedition." That is, Norton "followed defendant and waited for him to make some kind of violations." Once he began following defendant, Norton "narrate[d] the video to build his case." The court found that, when Norton "saw *** a lane crossing that supposedly took place in the middle lane"—which was "the one lane violation that occurred that caused [him to] stop" defendant—he had not yet caught up with defendant but was still "a great distance away." The court noted that, while Norton was not as far as a quarter mile behind defendant when he observed him cross the lane divider, Norton "certainly wasn't behind him either when he observed this supposed lane violation." The court emphasized that, because this lane violation was the reason Norton stopped defendant, the court was "not considering the speeding or the lack of speed." Although Norton testified that defendant was driving anywhere between 45 and 60 miles per hour, the court did not believe "that that is anything outside the realm of normal driving when you consider when you're being followed by an officer at 1:45 in the morning." The court also noted that "you've got weather conditions that come into play." Thus, the court was "not surprised that there's a little bit of leeway in the speed." and

"d[id]n't find that unreasonable." Last, the court noted that it was not factoring defendant's second instance of crossing a lane divider, "because the officer did not consider [it]" in deciding to initiate the stop but noticed it only after reviewing the squad-car video. In other words, Norton had "already intended on stopping [defendant]" when defendant crossed the dividing line the second time.

¶ 13                                                    II. ANALYSIS

¶ 14     We consider whether defendant's motion to quash and suppress should have been denied. "In reviewing the trial court's ruling on a motion to quash arrest and suppress evidence, [we] apply a two-part standard of review." *People v. Sims*, 2022 IL App (2d) 200391, ¶ 72. "First, we defer to the trial court's findings of fact and will reverse those findings only if they are against the manifest weight of the evidence." *Id.* "A finding is against the manifest weight of the evidence when it is unreasonable." *Id.*; see also *People v. Miller*, 2014 IL App (2d) 120873, ¶ 25 (noting that findings are against the manifest weight of the evidence if they are unreasonable, arbitrary, or not based on evidence or when an opposite conclusion is clearly evident). "Second, we review *de novo* the trial court's ultimate determination on whether the evidence should be suppressed." *Sims*, 2022 IL App (2d) 200391, ¶ 72.

¶ 15     Initially we note that several of the trial court's factual findings are against the manifest weight of the evidence. The trial court implicitly discounted Norton's testimony that he observed defendant straddling the lane divider at the Clavey Road overpass, stating that Norton was "a great distance away" and "certainly wasn't behind him either when he observed this *supposed* lane violation." (Emphasis added.). However, not only was Norton's testimony in this regard uncontroverted, but the video evidence introduced at trial, which we have reviewed, clearly shows that defendant straddled the lane divider at the Clavey Road overpass. Also, the trial court found

it likely that the weather conditions, combined with defendant's apparent knowledge that a police officer was following him, contributed to defendant's driving in the manner Norton observed. However, the only testimonial evidence concerning the weather's effect on driving came from Norton who testified that there was no accumulation on the roadway and that the weather did not affect his driving as he followed the defendant. While the video shows that the roadway was wet and that there was slight precipitation, it does not otherwise controvert Norton's testimony in this regard. Indeed, there is no snow accumulation on the through lanes where defendant was driving, and Norton's windshield wipers are not activated the entire time the video is recording defendant's driving. Additionally, the trial court's finding that defendant's erratic driving was a function in part of his knowledge that Norton was following him is without any support in the record. There was no testimony in this regard and all the problematic driving testified to and/or recorded occurred prior to the activation of Norton's squad lights. Before turning to whether there was a constitutional basis for the stop, we note further that the trial court did not otherwise question the unrebutted testimony of Norton as it related to defendant's driving after the violation at the Clavey Road overpass.

¶ 16    Having reviewed the trial court's factual findings, we consider *de novo* whether the stop was proper. In reviewing *de novo* the trial court's ultimate legal ruling, "we are 'free to undertake [our] own assessment of the facts in relation to the issues and may draw [our] own conclusions when deciding what relief should be granted.' " *City of Highland Park v. Kane*, 2013 IL App (2d) 120788, ¶ 11 (quoting *People v. Hackett*, 2012 IL 111781, ¶ 18). "Both the fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution of 1970 guarantee the right of individuals to be free from unreasonable searches and seizures." *Sims*, 2022 IL App (2d) 200391, ¶ 73; see also U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Under the limited-

lockstep doctrine, we generally interpret article I, section 6, of the Illinois Constitution in accord with the United States Supreme Court's interpretation of the fourth amendment of the United States Constitution. *People v. Holmes*, 2017 IL 120407, ¶ 24.

¶ 17    Although stopping a vehicle is generally reasonable if the police have " 'probable cause to believe that a traffic violation has occurred,' " the United States Supreme Court has determined that stopping a vehicle may also be constitutionally reasonable under the reasonable-and-articulable suspicion standard announced in *Terry* v. *Ohio*, 392 U.S. 1 (1968). *People v. Patel*, 2020 IL App (4th) 190917, ¶ 15 (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)). Neither probable cause nor reasonable and articulable suspicion under *Terry* constitutes proof beyond a reasonable doubt. *Id.*; *Kane*, 2013 IL App (2d) 120788, ¶ 10. "[P]robable cause exists when the arresting officer is aware of facts and circumstances that would lead a reasonably cautious person to conclude that the defendant committed a crime." *Kane*, 2013 IL App (2d) 120788, ¶ 10. Commission of a traffic offense provides probable cause to stop a vehicle. *Id.* Under the *Terry* standard, the police may stop a vehicle "based on reasonable suspicion— articulable, specific facts (and the rational inferences therefrom)—that suggest a crime has been or is about to be committed." *Patel*, 2020 IL App (4th) 190917, ¶ 15. Reasonable suspicion is a less demanding standard than probable cause. *Id.*

¶ 18    Before examining the constitutional reasonableness of the stop here, we address the trial court's suggestion that, because Norton had not observed defendant commit any traffic violations, Norton was engaged in a "fishing expedition" and not justified in *following* him. This is contrary to longstanding precedent. Norton was free to follow defendant, regardless of whether he observed defendant's car weaving or doing anything else suspicious at that time. See *Whren*, 517 U.S. at 813 (noting that an officer's motivation or subjective intentions play no role in evaluating the

reasonableness of a stop). It is only when an officer *detains* a subject that there must there be more than an unparticularized suspicion or a " 'hunch' " of criminal activity. *Patel*, 2020 IL App (4th) 190917, ¶ 15. Accordingly, our concern here is strictly whether the *stop* of defendant's car was constitutionally reasonable, and we do not concern ourselves with Norton's initial motivation for focusing on defendant's vehicle.

¶ 19 As noted above, the reasonableness of Norton's stop of defendant's vehicle is dependent on either a (1) reasonable and articulable suspicion that defendant committed or was about to commit a crime or (2) probable cause that a crime was committed. "When 'judging a police officer's conduct' in detaining a vehicle based on either probable cause or reasonable suspicion, 'we apply an objective standard.' " *Patel*, 2020 IL App (4th) 190917, ¶ 16 (quoting *People v. Hackett*, 2012 IL 111781, ¶ 29). The test employed is whether, when viewed objectively, the totality of the facts and circumstances would warrant a reasonable and prudent person to believe that a crime has been or is about to be committed. *Id.*

¶ 20 We determine that the facts and circumstances here warranted the stop. The evidence showed that no other vehicles were on Route 41 northbound when Norton spotted and decided to follow defendant's car. Nothing suggested that the way defendant drove was justified by the condition of the road, something on the road, or the weather conditions. As Norton followed defendant on Route 41, defendant's car continued to weave several times within its lane of traffic. Although weaving within a lane of traffic is not a violation under the Illinois Vehicle Code (Code) (625 ILCS 5/1-100 *et seq.* (West 2018)), weaving in this manner may justify a *Terry* stop. See *People v. Greco*, 336 Ill. App. 3d 253, 257, 259 (2003). In addition to weaving, defendant was repeatedly applying his brakes for no apparent reason. Although, like weaving, erratic braking might not be a violation under the Code, it may similarly justify a traffic stop under *Terry*. See

*Babers v. City of Tallassee, Alabama*, 152 F. Supp. 2d 1298, 1305 (M.D. Ala. 2001) (erratic braking provided police reasonable suspicion to stop vehicle).

¶ 21    Here, however, the record demonstrates more than erratic driving falling short of a traffic code violation. Not only did defendant's weaving and erratic braking arguably provide reasonable suspicion to warrant a *Terry* stop, there was also probable cause to believe that defendant committed traffic violations. Consistent with Norton's testimony, the squad video shows defendant straddling the dividing lanes both at the Clavey Road overpass and at Park Avenue. Section 11-709(a) of the Code provides, with exceptions inapplicable here, that motorists must drive their vehicles "as nearly as practicable entirely within a single lane." 625 ILCS 5/11-709(a) (West 2018). Driving in two lanes simultaneously constitutes a traffic violation. Needless to say, violation of a traffic law, however minor, provides probable cause to stop a vehicle. See *Patel*, 2020 IL App (4th) 190917, ¶ 15.

¶ 22    The trial court found that the improper lane usage at Park Avenue did not provide a valid basis for the stop because Norton had already decided to stop defendant based upon the Clavey Road violation. However, whether Norton relied on the Park Avenue violation, or whether he was even aware of it at the time he stopped defendant's vehicle for the Clavey Road violation, is irrelevant. In assessing whether the stop of a vehicle was reasonable, we are concerned with the objective facts, not what the officer knew at the time of the stop or the basis articulated by the officer for the stop. *Kane*, 2013 IL App (2d) 120788, ¶ 18 ("If *** an officer need not witness a violation of the law for that violation to justify a stop, then *** an officer certainly does not need to articulate that that same violation provided a reason for the stop."). Here, Norton's squad video clearly shows both the Clavey Road and Park Avenue instances of improper lane usage.

¶ 23    Moreover, Norton's testimony and the squad-car video indicate that he determined, using the pace method, that defendant drove at times anywhere between 5 to 16 miles over the speed limit.  See 625 ILCS 5/11-601(b) (West 2020) ("No person may drive a vehicle upon any highway of this State at a speed which is greater than the applicable statutory maximum speed limit.").  The pace method is a well-accepted method that an officer may employ to assess a motorist's speed.  See, *e.g.*, *People v. Ortiz*, 317 Ill. App. 3d 212, 215, 220 (2000) (parties agreed that stopping a defendant for speeding, which the officer determined after employing the pace method, is constitutionally reasonable).

¶ 24    Even if none of the above observations of defendant's driving were alone sufficient to establish a constitutionally reasonable basis to stop defendant—a conclusion we do not accept— the violations collectively justified the stop.  In *Greco*, this court determined that "swerv[ing] two or three times from the center of the road towards the curb" constituted "erratic driving sufficient to create a reasonable suspicion that [the] defendant was driving under the influence." *Greco*, 336 Ill. App. 3d at 259.  If swerving within a lane of traffic may provide, by itself, a constitutionally reasonable basis to stop a defendant, then swerving coupled with braking for no reason, crossing lane dividers, changing speed for no reason, and speeding—all observed in a four-minute span— are more than enough justification for a stop.

¶ 25    Defendant's reliance on *People v. Leyendecker*, 337 Ill. App. 3d 678 (2003), and *People v. Mueller*, 2018 IL App (2d) 170863, is misplaced.  In *Leyendecker*, an officer followed the defendant for two miles on a two-lane, two-way road. *Leyendecker*, 337 Ill. App. 3d at 680.  The defendant was eventually stopped only because she crossed the fog line as she drove her car around a curve on her left. *Id.* at 680, 682.  The evidence revealed that the road on which this occurred had a speed limit of 65 miles per hour, many curves, and poor visibility around those curves. *Id.*

at 680. No video recording of the violation was admitted in court. After the defendant was stopped, she was ticketed for driving while her driver's license was suspended. *Id.* 679-80. The defendant moved to suppress evidence of the suspension, arguing that the officer lacked reasonable suspicion that she committed a traffic offense before she was stopped. *Id.* at 680. The trial court, which was familiar with the area, found that the stop was constitutionally unreasonable. *Id.* at 680-81. On appeal, this court determined that given the nature of the road, the speed limit, the duration of the time the officer followed the defendant, and lack of any other violation of the law or suspicious driving, the stop was not justified. *Id.* at 682-83.

¶ 26 In *Mueller*, the officer followed the defendant for one mile on a road that "had 'some twists and turns.' " *Mueller*, 2018 IL App (2d) 170863, ¶¶ 6, 10. During that time, the officer saw the defendant drive on the yellow center line once and the fog line twice. *Id.* ¶¶ 4-5. The officer stopped the defendant because of these observations, issuing her a ticket for improper lane usage. *Id.* ¶¶ 1, 4-5. The defendant was eventually arrested for driving under the influence of alcohol, and she moved to quash her arrest and suppress evidence of her intoxication. *Id.* ¶¶ 1, 6, 8. At a hearing on that motion, the only basis the State argued for the stop was that defendant had committed improper lane usage. *Id.* ¶ 7. That is, the State never argued, for example, that the stop was justified based on erratic driving or weaving within a lane of traffic. *Id.* Moreover, no video recording of the violation was admitted at trial. *Id.* ¶ 6. The trial court granted the motion to quash and suppress, finding that the officer's testimony was, at best, " 'problematic' "; the defendant did not commit improper lane usage; and driving on the lane lines three times over a one-mile-long stretch of twisting and turning roadway did not justify stopping the defendant. *Id.* ¶¶ 8, 10. This court agreed that the officer lacked a proper basis to stop the defendant. *Id.* ¶ 21. After addressing what constitutes improper lane usage, we noted that, "even if [the] defendant's multiple touches

[of the traffic lines] could be considered 'lane deviations,' the road's 'twists and turns' provided an innocent (and obvious) explanation for those brief touches." *Id.* ¶ 28.

¶ 27 The glaring difference between this case and *Leyendecker* and *Mueller* is that, setting aside for the sake of analysis defendant's speeding and improper lane usage violations, Norton's stop of defendant was based on more than just the touching of a lane divider or a momentary crossing of a fog line at a twisting part of the roadway. Norton observed defendant varying his speed for no reason, erratically braking, and repeatedly weaving within his lane of traffic on a roadway that was generally straight, with the occasional gentle curve. These observations are more significant than those we found insufficient in *Leyendecker* and *Mueller*. While, as in *Leyendecker*, the trial court here expressed familiarity with the area where Norton made his observations, a recording of what Norton observed before he stopped defendant rendered this familiarity of little consequence. While no video recording was admitted in either *Leyendecker* or *Mueller,* the squad-car video here provided an objective record entirely corroborating Norton's testimony. The squad-car video shows that Route 41 gradually curved a few times, but was, for the most part, straight. This is a far cry from the " 'twists and turns' " in *Mueller* and the many curves and poor visibility in *Leyendecker*. Thus, while the nature of the roads in *Leyendecker* and *Mueller* may have excused the defendant's manner of driving, the same cannot be said here. And of course, as noted earlier, defendant's speeding, not to mention his improper lane usage at the Clavey Road overpass and at Park Avenue, provided probable cause to stop defendant's vehicle.

¶ 28                          III. CONCLUSION

¶ 29 For the reasons stated, we reverse the judgment of the circuit court of Lake County and remand this cause for further proceedings.

¶ 30 Reversed and remanded.